**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LESLY YAJAYRA PERDOMO,
                    *Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,
                    *Respondent.*

No. 06-71652

Agency No.
A077-845-685

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
July 16, 2009—San Francisco, California

Filed July 12, 2010

Before: Dorothy W. Nelson, William A. Fletcher, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

## COUNSEL

Alan Hutchison, Reno, Nevada, for petitioner Lesly Yajayra Perdomo.

Peter D. Keisler, Linda S. Wendtland, John C. Cunningham, and M. Jocelyn Lopez Wright, Washington, D.C., for respondent Eric H. Holder Jr.

**OPINION**

PAEZ, Circuit Judge:

Lesly Yajayra Perdomo ("Perdomo"), a native and citizen of Guatemala, petitions for review of the Board of Immigration Appeals' ("BIA") affirmance of the immigration judge's ("IJ") order denying asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT"). Perdomo sought asylum based on her fear of persecution as a young woman in Guatemala. Specifically, Perdomo argued that women were murdered at a high rate with impunity. The IJ denied the application because she found that young women in Guatemala were not a cognizable social group. The BIA affirmed, finding that a social group consisting of "all women in Guatemala" is over-broad and "a mere demographic division of the population rather than a particular social group."

Because the BIA's decision is inconsistent with its own precedent and this court's case law, we grant the petition and remand for further proceedings.

## I.  Factual and Procedural Background

Lesly Yajayra Perdomo is a citizen and native of Guatemala. She left Guatemala at age fifteen to join her mother in the United States in April 1991.[1] She entered the United States without inspection or parole.

Perdomo has lived continuously in the United States since her entry in 1991, and she is fluent in English and Spanish. She completed high school in Reno, Nevada, and is currently

---

[1]Prior to Perdomo's entry, her mother filed an application for asylum based on country conditions in Guatemala and her fear of being killed. She included Perdomo in her application, which was filed in 1985 and denied in 1986.

employed as a Medicaid account executive at a medical facility in Reno. Perdomo is single, and she has no children. Both of Perdomo's parents are deceased, and she no longer has any close relatives in Guatemala; she currently lives with her stepfather and sister in Reno. Perdomo is actively involved in her Pentecostal church.

On April 21, 2003, the Immigration and Naturalization Service ("INS")[2] issued Perdomo a Notice to Appear, charging her as removable under Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(6)(A)(i), for having unlawfully entered the United States. Perdomo conceded removability at her master calendar hearing on January 28, 2004, and requested asylum, withholding of removal, and relief under CAT.

She requested asylum because she feared persecution as a member of a particular social group consisting of women between the ages of fourteen and forty. Perdomo testified that her fear was based on the high incidence of murder of women in Guatemala, and her own status as a Guatemalan woman. She provided the IJ with several reports by the Guatemala Human Rights Commission, which is based in the United States, documenting the torture and killing of women, the brutality of the killings, the non-responsiveness of the Guatemalan government to such atrocities, the countrywide prevalence of the killings, and the lack of explanation for the killings. Perdomo did not assert that she was the victim of past persecution; rather, she expressed a fear of future persecution if she were returned to Guatemala. Perdomo also testified that she would be targeted because she would not be accepted as a

---

[2]The Immigration and Naturalization Service, or "INS," was dissolved in 2002 by the Homeland Security Act, Pub. L. No. 107-296, § 101(a), 116 Stat. 2135, 2142 (2002). Under the Act, most of the INS's functions were transferred to various components of the newly constituted Department of Homeland Security ("DHS"), such as the U.S. Citizenship and Immigration Services. For consistency purposes, we use the term INS.

native citizen in Guatemala, but would be considered an American with financial resources due to the number of years that she has lived in the United States. She further testified that she may be targeted because of her active involvement in the Pentecostal church as well as her lack of family and other personal contacts in Guatemala. Perdomo also testified that she would not be able to obtain employment in Guatemala because the secretarial positions listed in Guatemalan newspapers only accept female applicants between the ages of eighteen and twenty-five, and job applications must be submitted with photographs.

Although the IJ found Perdomo's testimony to be credible and truthful, she denied the applications for asylum, withholding of removal, and relief under CAT. The IJ noted that she was "sympathetic to the plight of the respondent," but declined to make the "finding that women between the ages of fourteen and forty who are Guatemalan and live in the United States form a particular social group which would entitle [Perdomo] to relief."

On appeal, the BIA agreed with the IJ's determination that Perdomo failed to establish a well-founded fear of future persecution in Guatemala on account of her membership in a particular social group. The BIA considered the group of "women between the ages of fourteen and forty who are Guatemalan and live in the United States" to be too broad to qualify as a protected social group. The BIA also rejected Perdomo's revised definition of the protected social group — "all women in Guatemala." The BIA concluded that this social group was even broader, and was a demographic rather than a cognizable social group under the INA. The BIA also upheld the IJ's denial of withholding of removal and relief under CAT, and granted Perdomo sixty days for voluntary departure.

## II. JURISDICTION

Our jurisdiction to review a final order of removal is governed by 8 U.S.C. § 1252. We have jurisdiction to review the denial of an asylum application when a petitioner raises a question of law, including mixed questions of law and fact.[3] *Morales v. Gonzales*, 478 F.3d 972, 978-80 (9th Cir. 2007).

## III. STANDARD OF REVIEW

Whether a group constitutes a "particular social group" under the INA is a question of law we review de novo. *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1091 (9th Cir. 2000).

Where the BIA conducts its own review of the evidence and law rather than simply adopting the immigration judge's decision, as here, our review is limited to the BIA's decision. *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006).

## IV. DISCUSSION

### A. General Framework

The Attorney General may, in his discretion, grant asylum to an alien who qualifies as a refugee within the meaning of INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). INA § 208(a)-(b)(1)(A), 8 U.S.C. § 1158(a)-(b)(1)(A). An alien establishes refugee status if she is unable or unwilling to return to her country of nationality either because of past persecution or a well-founded fear of future persecution on account of her race, religion, nationality, political opinion or membership in a particular social group. INA

---

[3]Petitioner did not challenge the agency's denial of withholding of removal and relief under CAT in her petition for review with this court. Because Petitioner has abandoned those issues, we do not address them here.

§ 101(a)(42)(A); 8 U.S.C. § 1101(a)(42)(A); *Karouni v. Gonzales*, 399 F.3d 1163, 1170 (9th Cir. 2005). The applicant bears the burden of proving her eligibility for refugee status. *Prasad v. INS*, 47 F.3d 336, 338 (9th Cir. 1995).

## B.   *Women as a Particular Social Group*

**[1]** The INA does not provide a definition for the term "particular social group." *Hernandez-Montiel*, 225 F.3d at 1091. The BIA has interpreted the term to mean a group with members who "share a common, immutable characteristic" that "members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985); *In re C-A-*, 23 I. & N. Dec. 951, 955-56 (BIA 2006) (quoting the *Acosta* formulation and affirming continued adherence to it). The BIA has explained that "[t]he shared characteristic might be an innate one such as sex, color, or kinship ties," which would make the fact of membership "something comparable to the other four grounds of persecution under the Act,⁴ namely, something that is beyond the power of an individual to change or that is so fundamental to his identity or conscience that it ought not be required to be changed." *In re C-A-*, 23 I. & N. Dec. at 955 (quoting *Acosta*, 19 I. & N. Dec. at 233-34). The BIA also has clarified that a group must have "social visibility" and adequate "particularity" to constitute a protected social group. *In re A-M-E & J-G-U-*, 24 I. & N. Dec. 69, 75-76 (BIA 2007). The BIA, however, does not "generally require a 'voluntary associational relationship,' 'cohesiveness,' or strict 'homogeneity among group members.' " *Id.* at 74.

**[2]** The BIA has not yet specifically addressed in a precedential decision whether gender by itself could form the basis of a particular social group. It has, however, recognized as a

---

⁴The four other grounds are race, religion, nationality, and political opinion. *See* 8 U.S.C. § 1101(a)(42)(A).

"particular social group" women who belong to a particular tribe and who oppose female genital mutilation because that group is defined by characteristics that cannot be changed or should not be changed. *In re Fauziya Kasinga*, 21 I. & N. Dec. 357, 366 (BIA 1996). Whether females in a particular country, without any other defining characteristics, could constitute a protected social group remains an unresolved question for the BIA.

Our case law examining asylum claims based on membership in a particular social group continues to evolve. Initially, we required a "voluntary associational relationship among the purported members, which imparts some common characteristic that is fundamental to their identity as a member of that discrete social group." *Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir. 1986). We reasoned that the term "particular social group" was intended to apply to "cohesive, homogeneous group[s]" in order to avoid "extending refugee status to every alien displaced by general conditions of unrest or violence in his or her home country." *Id.* at 1577.

**[3]** More recently, recognizing that we were the only circuit to require a "voluntary associational relationship," and noting that members of some social groups do not associate by choice, we developed a two-pronged approach to recognizing a protected social group. *Hernandez-Montiel*, 225 F.3d at 1092. In *Hernandez-Montiel*, we held that "[A] 'particular social group' is one united by a voluntary association, including a former association, *or* by an innate characteristic that is so fundamental to the identities or consciences of its members that members either cannot or should not be required to change it." *Id.* at 1093. Applying this definition, the court held that "gay men with female sexual identities in Mexico" constituted a particular social group. *Id.* at 1094. In so holding, we reasoned that "[s]exual orientation and sexual identity are immutable" and "are so fundamental to one's identity that a person should not be required to abandon them." *Id.* at 1093. We further noted that the evidence demonstrated that mem-

bers of this group were specifically targeted for persecution "on account of" these characteristics. *Id.* at 1093-94. We have also said, consistent with the BIA, that "social visibility" and "particularity" are factors to consider in determining whether a group constitutes a "particular social group" under the INA. *Santos-Lemus v. Mukasey*, 542 F.3d 738, 744 (9th Cir. 2008).

**[4]** While we have not held expressly that females, without other defining characteristics, constitute a particular social group,[5] we have concluded that females, or young girls of a particular clan, met our definition of a particular social group. *Mohammed v. Gonzales*, 400 F.3d 785, 798 (9th Cir. 2005). In *Mohammed*, we recognized that gender is an "innate characteristic" that is "fundamental to [one's] identit[y]." *Id.* at 797. We noted that the INS's (now U.S. Citizenship and Immigration Services') " 'Gender Guidelines,' which provide Asylum Officers with guidance on adjudicating women's claims of asylum, state that gender is an immutable trait that can qualify under the rubric of 'particular social group.' " *Id.* at 797-98. We also considered the guidelines of the Office of the United Nations High Commissioner for Refugees, the United Nations agency responsible for refugee protection worldwide, which "ma[ke] clear that 'women may constitute a particular social group under certain circumstances based on the common characteristic of sex, whether or not they associate with one another based on that shared characteristic.' " *Id.* at 798. After holding that female genital mutilation constitutes persecution and noting that genital mutilation clearly occurs on account of being female, we concluded that the petitioner's claim that "she was persecuted 'on account of'

---

[5]One of our sister circuits has recognized gender as the basis for a particular social group, relying on the BIA's *Acosta* decision. *See Fatin v. INS*, 12 F.3d 1233 (3rd Cir. 1993). We also note that Australia, Canada, and the United Kingdom have recognized gender as the basis for a particular social group. *See, e.g.*, *Minister for Immigration & Multicultural Affairs v. Khawar* (2002) 76 A.L.J.R. 667; *Higbogun v. Canada*, [2010] F.C. 445 (describing Gender Guidelines); *Islam v. Sec'y of State for the Home Dep't*, 2 All E.R. 546 (1999).

her membership in a social group, whether it be defined as the social group comprised of Somalian females, or a more narrowly circumscribed group, such as young girls in the Benadiri clan, not only reflects a plausible construction of our asylum law, *but the only plausible construction.*" *Id.* (emphasis added). Thus, we clearly acknowledged that women in a particular country, regardless of ethnicity or clan membership, could form a particular social group. The Eighth Circuit has followed our reasoning in *Mohammed*, holding that "Somali females" constitute a particular social group. *Hassan v. Gonzales*, 484 F.3d 513, 518 (8th Cir. 2007).

## C.   The BIA's Analysis of Perdomo's Claim

**[5]** Perdomo argues that women in Guatemala comprise a "particular social group" at high risk of "femicide," and that as a woman she has an objectively well-founded fear of future persecution in Guatemala.[6] The BIA dismissed Perdomo's appeal solely on the ground that "all women in Guatemala" could not constitute a cognizable social group, without reaching the question of whether Perdomo had demonstrated a nexus between her membership in that group and her fear of persecution. We therefore consider only whether the BIA erred in determining that women in Guatemala cannot be a cognizable social group. *See Andia v. Ashcroft*, 359 F.3d 1181, 1184 (9th Cir. 2004) (per curiam) ("In reviewing the decision of the BIA, we consider only the grounds relied upon by that agency. If we conclude that the BIA's decision cannot be sustained upon its reasoning, we must remand to allow the agency to decide any issues remaining in the case."); *see also Navas v. INS*, 217 F.3d 646, 658 n.16 (9th Cir. 2000) ("[T]his court cannot affirm the BIA on a ground upon which it did not rely.").

---

[6]As previously noted, before the IJ, Perdomo defined the social group as "women between the ages of fourteen and forty and who had lived in the U.S." In her briefs to the BIA and to this court, Perdomo argued that she belongs to a protected social group consisting of "all women in Guatemala."

The BIA reasoned that "all women in Guatemala" is overly broad and internally diverse, and constitutes "a mere demographic division . . . rather than a particular social group." The BIA relied on our decision in *Sanchez-Trujillo* in which we said that a group could not be defined by a "sweeping demographic division" where its members "naturally manifest a plethora of different lifestyles, varying interests, diverse cultures, and contrary political leanings." *Sanchez-Trujillo*, 801 F.2d at 1576-77. In *Sanchez-Trujillo*, we ultimately held that "young, urban, working class males of military age who had never served in the military or otherwise expressed support for the government of El Salvador" did not constitute a particular social group for purposes of asylum. *Id*. at 1577.

An analysis of whether a particular social group qualifies for asylum does not end with *Sanchez-Trujillo*, however. Under *Hernandez-Montiel*, which is based in large part on the BIA's *Acosta* decision, an innate characteristic may be the basis for a protected social group. Indeed, we have focused on the innate characteristics of such broad and internally diverse social groups as homosexuals and Gypsies to conclude that they constituted particular social groups for purposes of asylum. *Karouni v. Gonzales*, 399 F.3d 1163, 1172 (9th Cir. 2005) (holding that "*all* alien homosexuals are members of a 'particular social group' "); *Mihalev v. Ashcroft*, 388 F.3d 722, 726 (9th Cir. 2004) (concluding that "[t]here is no question that Gypsies are an identifiable ethnic group and that being a Gypsy is a protected ground [for asylum]").

To the extent we have rejected certain social groups as too broad, we have done so where "[t]here is no unifying relationship or *characteristic* to narrow th[e] diverse and disconnected group." *Ochoa v. Gonzales*, 406 F.3d 1166, 1171 (9th Cir. 2005) (emphasis added). In *Ochoa*, the court determined that "business owners in Colombia who rejected demands by narco-traffickers to participate in illegal activity" was too broad because such a group had neither a voluntary relationship nor an innate characteristic to bond its members. *Id.* at

1170-71. Most recently, in *Delgado-Ortiz v. Holder*, 600 F.3d 1148, 1151-52 (9th Cir. 2010), we noted that the proposed social group, "returning Mexicans from the United States," was similar to the types of large and diverse social groups we considered in *Ochoa* and *Sanchez-Trujillo*, which we concluded were too broad to qualify as cognizable social groups because they shared neither a voluntary relationship nor an innate characteristic.[7]

Additionally, we have rejected the notion that a persecuted group may simply represent too large a portion of a population to allow its members to qualify for asylum. *Singh v. INS*, 94 F.3d 1353, 1359 (9th Cir. 1996). In *Singh*, the BIA denied asylum to an Indo-Fijian man because his past persecution "arose not out of any of the respondent's individual circumstances but rather was part of and parcel of the general level of violence . . . directed against Indo-Fijians," who constituted half the population of Fiji. *Id.* at 1356, 1358. On appeal, we "reject[ed] the notion that an applicant is ineligible for asylum merely because all members of a persecuted group might be eligible for asylum." *Id.* at 1359. Although the court did not consider whether Indo-Fijians were a particular social group, its reasoning supports the principle that the size and breadth of a group alone does not preclude a group from qualifying as such a social group.

**[6]** Because the BIA failed to apply both prongs of the *Hernandez-Montiel* definition to Perdomo's claim that women

---

[7]We note, however, that neither the drafting language of the 1951 Convention relating to the Status of Refugees, July 28, 1951, 10 U.S.T. 6259, 189 U.N.T.S. 150, nor the United Nations High Commissioner for Refugees' ("UNHCR") *Handbook on Procedures and Criteria for Determining Refugee Status* (Geneva 1992) requires that a particular social group be narrowly defined. *See* T. Alexander Aleinikoff, *Protected Characteristics and Social Perceptions: An Analysis of the Meaning of 'Membership of a Particular Social Group,' in* REFUGEE PROTECTION IN INTERNATIONAL LAW, UNHCR's GLOBAL CONSULTATIONS ON INTERNATIONAL PROTECTION 263, 265-267 (Erika Feller et al. eds., 2003).

in Guatemala constitute a particular social group, and because the BIA's decision is inconsistent with its own opinions in *Matter of Acosta*, 19 I. & N. Dec. at 233-34, and *In re C-A-*, 23 I. & N. Dec. at 955, we grant Perdomo's petition for review. We are mindful that under the ordinary remand rule, the agency should be given an opportunity in the first instance to make legal determinations entrusted to it by Congress. *See Gonzales v. Thomas*, 547 U.S. 183, 185 (2006). This rule is particularly applicable here because we have said that " '[p]articular social group' . . . is an amorphous term." *See Ramos-Lopez v. Holder*, 563 F.3d 855, 859 (9th Cir. 2009). We therefore remand for the BIA to determine in the first instance whether women in Guatemala constitute a particular social group, and, if so, whether Perdomo has demonstrated a fear of persecution "on account of" her membership in such a group. *See Thomas*, 547 U.S. at 185; *see also Negusie v. Holder*, 129 S.Ct. 1159, 1167-68 (2009).

## V.   CONCLUSION

The petition for review is granted and remanded for further proceedings consistent with this opinion.

## PETITION FOR REVIEW GRANTED; REMANDED.