**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| REBECA RUFINA CRISTOBAL ANTONIO, | No. 21-70624 |
| *Petitioner,* | |
| | Agency No. A206-498-048 |
| v. | |
| MERRICK B. GARLAND, Attorney General, | OPINION |
| *Respondent.* | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted July 13, 2022
Pasadena, California

Filed January 26, 2023

Before: Mark J. Bennett and Gabriel P. Sanchez, Circuit
Judges, and Elizabeth E. Foote,[*] District Judge.

Opinion by Judge Bennett;
Concurrence by Judge Sanchez

---

[*] The Honorable Elizabeth E. Foote, United States District Judge for the
Western District of Louisiana, sitting by designation.

## SUMMARY[**]

### Immigration

Granting Rebeca Cristobal Antonio's petition for review of the Board of Immigration Appeals' decision upholding the denial of asylum and related relief, and remanding, the panel held that (1) substantial evidence did not support the agency's determination that the treatment Antonio suffered did not amount to persecution, (2) the agency erred in characterizing Antonio's proposed social group and concluding that it was not cognizable, and (3) the agency erred by failing to consider highly probative evidence regarding the Guatemalan government's willingness or ability to control the persecution.

Individuals in Antonio's community verbally and physically harassed and threatened her with death because they perceived her to be a lesbian because she wore men's clothing to work. Specifically, Antonio's neighbors threatened that if she dressed in men's clothing they would "get together and burn her down and whip her," and told her that if she did not leave the community, they would kill her. The panel explained that in concluding that this treatment amounted simply to threats the immigration judge failed to recognize that threats may be compelling evidence of past persecution, particularly when the threats are specific and menacing and accompanied by violent confrontations, near-confrontations and vandalism.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel explained that in this case, the record revealed much more than threats alone.  A crowd met Antonio at her workplace and threatened to lynch and burn her if she did not remove the men's clothing.  Her neighbors told her husband they believed she was bisexual or lesbian, and even spoke with her grandparents, who were scared for her safety.  Community members took her to the police because they perceived her to be a lesbian, and Antonio's family members violently attacked her.  Taken together, the panel concluded that the death threats, mob violence, involuntary transport to the police station, and repeated whipping by her uncles compelled the conclusion that Antonio suffered past persecution.

Antonio asserted that she was persecuted on account of her membership in a social group comprised of "wom[e]n in Guatemala who are perceived to have male tendencies and are seen as dangerous to the community."  The IJ found this articulation too "amorphous" and reasoned that the style of Antonio's dress was not an immutable characteristic qualifying as a particular social group.  The IJ further stated that Antonio's claim was not a gender or sexual orientation issue because Antonio indicated that she was not a lesbian.  The panel wrote that this finding ignored Antonio's arguments before both the IJ and the BIA that she belonged to a different particular social group comprised of "women in Guatemala who are perceived to be lesbian."  The panel explained that the agency is not free to ignore arguments raised before it, and that the failure to address a social group claim, or failure to analyze such a claim under the correct legal standard, constitutes error and requires remand.  The panel observed that although this court has discussed the issue, neither this court in a published opinion, nor the BIA, has explicitly recognized perceived or imputed sexual

orientation as a cognizable social group. The panel remanded for the agency to determine whether women in Guatemala perceived to be lesbian constitute a particular social group, and if so, whether Antonio's persecution was on account of her membership in that group.

In concluding that Antonio did not show persecution committed by the government or by forces that the government was unwilling or unable to control, the IJ's analysis focused on Antonio's complaint to the Justice of the Peace and the Justice of the Peace's decision to remit the matter for criminal investigation. The panel explained that this decision does not end the inquiry, as the government's failure to take promised future action may establish that the government was either unable or unwilling to exercise such control. The panel wrote that in this case no record evidence indicated whether the criminal referral by the Justice of the Peace led to any arrests, criminal prosecution, or other action by authorities to minimize the threats against Antonio.

Further, the panel wrote that the record suggested that the agency failed to consider all of the evidence, such as Antonio's statements that the mayor of her village "would be behind [her neighbors] if they try to kill [her]," and that she fears the mayor the most because "[h]e is the one who has the last decision whether to kill me or not." Moreover, the panel wrote that the record revealed that the police took some action to end Antonio's harassment temporarily but did not make any arrests—even when the police arrived at the scene of a crowd threatening to kill Antonio. The panel noted that the IJ did not explicitly address evidence that the death threats continued despite police awareness. Nor did it address the abuse Antonio's uncles inflicted against her.

Finally, the panel observed that although the IJ considered the Country Condition Report as to Antonio's CAT claim, the report indicated that Guatemala's antidiscrimination laws do not apply to LGBTI individuals who often face police abuse, and that the government's efforts to address widespread discrimination against LGBTI people have been "minimal." The panel noted that the IJ found the report irrelevant because Antonio stated she is not a lesbian. However, given the reasons for remand of Antonio's social group claim, the panel wrote that the agency might view this country report evidence differently on remand.

Concurring, Judge Sanchez wrote separately to address the question of perceived or imputed sexual orientation and whether such group should be recognized as a particular social group. Judge Sanchez agreed that neither this court nor the BIA has recognized in published authority that such a group would qualify, and that remand was warranted for the BIA to address this issue in the first instance. Judge Sanchez explained, however, that under longstanding circuit and BIA precedent involving persecution on account of imputed protected characteristics and addressing the importance of the perception of the persecutor, the answer to this question seems clear that perceived or imputed sexual orientation would qualify as a particular social group.

# COUNSEL

Marco A. Jimenez (argued), Jimenez Law Office, Riverside, California, for Petitioner.

John F. Stanton (argued), Rosanne M. Perry, and Nelle M. Seymour, Trial Attorneys; Leslie McKay, Senior Litigation Counsel; Brian Boynton, Acting Assistant Attorney General; United States Department of Justice, Office of Immigration Litigation, Civil Division; Washington, D.C.; for Respondent.

# OPINION

BENNETT, Circuit Judge:

Rebeca Cristobal Antonio, a native and citizen of Guatemala, petitions for review of the Board of Immigration Appeals' ("BIA") streamlined affirmance of the immigration judge's ("IJ") denial of her claims for asylum, withholding of removal, and protection under the United Nations Convention Against Torture ("CAT"). Antonio was verbally and physically harassed and received death threats because her community in Guatemala perceived her to be a lesbian, including because she wore men's clothing to work. In her petition for review, Antonio challenges the IJ's findings that: (1) this treatment did not amount to persecution, (2) the relevant social group for asylum purposes is based on "manner of dress," and (3) no persecution was committed by the Guatemalan government or by forces that the government was unwilling or unable to control. The first finding is not supported by substantial evidence in the record. The second finding suffers from

several errors discussed below. And in making the third finding, the agency did not consider all highly probative evidence in the record. We therefore grant the petition and remand for further proceedings.

## I. BACKGROUND

When Antonio applied for entry into the United States in March 2014, an asylum officer found that she had a credible fear of persecution. In the notes of the credible fear interview, the asylum officer wrote:

> You stated that starting about one year ago you began to dress in men's clothing in order to find work. As a result, the townspeople from your village labeled you a lesbian. Your neighbors threatened to kill you if you remained in the village because they do not approve of lesbians. Your uncles whipped you up frequently because they wanted you to give them food and money, and they also insulted you about being a lesbian.

Although Antonio specifically told the asylum officer that she was not a lesbian, she described threats she received because the villagers believed she was a lesbian: "[T]hey would get together and burn me down and whip me." "They said that if I didn't leave that place they would kill me." "[T]hey did not want any lesbian women in the village." Based on these threats, the asylum officer noted that Antonio alleged membership in a particular social group: "The people from your village and your family members are motivated to harm you with at least one central reason being that they believe that you are a member of the particular social group that is lesbian women in Guatemala."

Besides detailing her fear, Antonio explained why she could not seek help from local authorities. Her testimony to the asylum officer suggests that she told the police about her problems "but they didn't pay attention to me … because they told me that I have to tell them that I am not the kind of person that they think that I am."[1] She also told the asylum officer that her neighbors said that "the police wouldn't do anything" if her neighbors tortured her. And she expressed fear of her village's mayor: "He is the one who has the last decision whether to kill me or not."[2] She stated that the mayor "would be behind [her neighbors] if they try to kill [her]."

The Department of Homeland Security issued a notice to appear charging Antonio with removability as an individual without a valid entry document at the time of application for admission. 8 U.S.C. § 1182(a)(7)(A)(i)(I). Antonio applied for asylum, withholding of removal, and protection under CAT. Her application stated that when she started wearing pants to work, which entailed collecting logs and grasses, her community started to shout at her that she was a lesbian and that they would kill her because she was a "wrong example for their children."

In a written declaration Antonio submitted in lieu of testimony at her asylum hearing before the IJ, she said that her community tortured her "for dressing up as a man,"

---

[1] The record could plausibly be read as attributing this statement to Antonio's uncles, but in context, it appears that Antonio is referring to the police. In either case, this testimony supports her argument that she was persecuted on account of her perceived sexual orientation.

[2] Antonio did not comment on her fear of the mayor in her declaration, was not asked about this fear further at the hearing, and did not mention this fear in her appellate brief.

including by taking her to the police, because they believed "dressing up as a man means that [she is] a lesbian" and sets "a bad example for the children" in the village.**3**  The police let her go, but the death threats did not stop.  The declaration adds that Antonio's "grandparents got worried and told [her] not to work so the community would not hurt [her]."  She married a man but eventually "separated from [her] husband" due to the persistent rumors and harassment.  She left for the United States because she wanted to end her torment.

At the asylum hearing, Antonio also submitted a complaint that she filed against her harassers with a Justice of the Peace of the municipality of San Pedro.  In it, she explained how her marriage fell apart because of the rumors about her sexuality.  The harassment escalated after that.  On December 20, 2013, members of the community waited for her at her place of work and attempted to lynch her.  They demanded that she remove the men's clothing, or else she "was going to burn."  Someone called the authorities, who "rescue[d]" her.  Antonio also submitted the decision; the local court denounced the behavior as "crimes of [d]iscrimination, insult and threats" and "remit[ted] the proceedings to the municipal Prosecutor of the Public Ministry . . . for the corresponding criminal investigation."**4**

The IJ found Antonio credible, noting "that her declaration is consistent with the documentary evidence that

---

[3] The IJ asked her additional questions on the record.

[4] The parties stated at oral argument that they do not know if the local government prosecuted Antonio's assailants after the Justice of the Peace referred the case to the municipal prosecutor.  Oral Arg. at 5:40–5:50; 18:40–19:10.

she provided, specifically, the police report that she gave in her documents." On the issue of past persecution, the IJ first found that the community's threats did not rise to the level of persecution, although the decision did not discuss the repeated whipping by her uncles that Antonio described in her credible fear interview. Second, the IJ denied that Antonio belonged to a cognizable particular social group, finding that "style of her dress" is not an immutable characteristic and stating that Antonio's "articulated particular social group"—which the IJ did not restate in her order—"is . . . too amorphous for [the IJ] to be able to say it fits within the particular social group analysis."[5] The IJ specifically rejected the notion that Antonio presented a "sexual orientation issue because Respondent stated she was not a lesbian." Finally, the IJ found that the Guatemalan government did not persecute her or acquiesce in her persecution.[6] The IJ highlighted that the "criminal branch municipality of San Pedro Soloma Court of La Paz . . . denounced [the facts] as discrimination, insults, and threats, and then said that the court was inhibited and remits proceedings to headquarters for a corresponding criminal investigation." Thus, the IJ denied her application for

---

[5] During the hearing, Antonio's counsel phrased the particular social group as "wom[e]n in Guatemala who are perceived to have male tendencies and are seen as dangerous to the community."

[6] We interpret the IJ's finding that the Guatemalan government did not acquiesce in Antonio's persecution, as a finding that Antonio was not persecuted by the Guatemalan government or "forces that the government was unable or unwilling to control." *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1062 (9th Cir. 2017) (en banc); 8 U.S.C. § 1101(a)(42).

asylum.[7] A single member of the BIA affirmed the IJ without opinion under 8 C.F.R. § 1003.1(e)(4).

## II. JURISDICTION

We have jurisdiction to review Antonio's final order of removal under 8 U.S.C. § 1252(a)(1). "We have jurisdiction to review the denial of an asylum application when a petitioner raises a question of law, including mixed questions of law and fact." *Perdomo v. Holder*, 611 F.3d 662, 665 (9th Cir. 2010).

## III. STANDARD OF REVIEW

"Where, as here, the BIA summarily adopts the IJ's decision without opinion pursuant to 8 C.F.R. § 1003.1(e)(4), we 'review the IJ's decision as if it were the BIA's decision.'" *Ren v. Holder*, 648 F.3d 1079, 1083 (9th Cir. 2011) (quoting *Zheng v. Ashcroft*, 397 F.3d 1139, 1143 (9th Cir. 2005)). We review de novo whether a group constitutes a "particular social group" under the Immigration and Nationality Act ("INA"). *Barbosa v. Barr*, 926 F.3d 1053, 1059 (9th Cir. 2019). We review "for substantial evidence the [agency's] determination that a petitioner has failed to establish eligibility for asylum or withholding of removal," including the "determination that a petitioner's past harm does not amount to past persecution." *Sharma v. Garland*, 9 F.4th 1052, 1060 (9th Cir. 2021) (cleaned up).[8]

---

[7] The IJ also denied her claim for withholding of removal and CAT protection. Because Antonio offers no substantive argument on the denial of CAT protection, we consider that claim waived. *Martinez-Serrano v. I.N.S.*, 94 F.3d 1256, 1259 (9th Cir. 1996).

[8] As discussed in *Flores Molina v. Garland*, 37 F.4th 626, 633 n.2 (9th Cir. 2022), the standard of review for past persecution is currently unsettled. *Compare Kaur v. Wilkinson*, 986 F.3d 1216, 1221 (9th Cir.

Under this "'highly deferential' standard," we "must accept 'administrative findings' as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Garland v. Ming Dai*, 141 S. Ct. 1669, 1677 (2021) (quoting *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020), and 8 U.S.C. § 1252(b)(4)(B)).

## IV. DISCUSSION

To qualify for asylum based on past persecution, an applicant must establish that: "(1) [her] treatment rises to the level of persecution; (2) the persecution was on account of one or more protected grounds; and (3) the persecution was committed by the government, or by forces that the government was unable or unwilling to control." *Bringas-Rodriguez*, 850 F.3d at 1062. We review each prong in turn.

### A. Past Persecution

Persecution is "the infliction of suffering or harm upon those who differ . . . in a way regarded as offensive." *Lanza v. Ashcroft*, 389 F.3d 917, 934 (9th Cir. 2004) (quoting *Korablina v. I.N.S.*, 158 F.3d 1038, 1043 (9th Cir. 1998)). "[P]ersecution . . . is 'an extreme concept that does not include every sort of treatment our society regards as

---

2021) (reviewing de novo whether particular acts constitute persecution), *with Sharma v. Garland*, 9 F.4th 1052, 1060 (9th Cir. 2021) (applying substantial evidence standard). We need not "discuss the nuances of the two standards" because Antonio's harm amounts to persecution even under the more deferential "substantial evidence" standard. *See Flores Molina*, 37 F.4th at 633 n.2; *see also Singh v. Garland*, 48 F.4th 1059, 1066–67 (9th Cir. 2022) (noting disagreement about the proper standard of review and reversing a BIA finding of no past persecution even under the more deferential substantial evidence standard).

offensive.'" *Id.* (quoting *Nagoulko v. I.N.S.*, 333 F.3d 1012, 1016 (9th Cir. 2003)).

Antonio's neighbors "threatened that if [she] dressed [in men's clothing] they would get together and burn [her] down and whip [her]." They specifically told her that if she did not leave, they would kill her. The IJ discussed in her order how Antonio's community "told her to remove her clothes or else burn." The IJ's conclusion that this harassment amounted to "simply threats," failed to consider that this Court has "repeatedly held that threats may be compelling evidence of past persecution, particularly when they are specific and menacing and are accompanied by . . . violent confrontations, near-confrontations and vandalism." *Mashiri v. Ashcroft*, 383 F.3d 1112, 1119 (9th Cir. 2004). Indeed, although the government correctly argues that there is no "blanket rule that in every case threats, without more, compel a finding of past persecution," "[d]eath threats alone can constitute persecution." *Kaur*, 986 F.3d at 1227; *see also Navas v. I.N.S.*, 217 F.3d 646, 658 (9th Cir. 2000).

In this case, the record reveals much more than threats alone. A crowd met Antonio at her workplace and threatened to lynch and burn her if she did not remove the men's clothing. Her neighbors told her husband they believed she was bisexual or lesbian, and "even spoke with [her] grandparents," who were "scared for [her] safety." The community took her to the police because they perceived her to be a lesbian. We have held that the frequency, escalation, and seriousness of threats, as well as the fact that persecutors threatened a petitioner in close confrontations and confronted petitioner's family, can be sufficient to compel the conclusion that the threats rise to the level of persecution. *See Ruano v. Ashcroft*, 301 F.3d 1155, 1160–61 (9th Cir. 2002). That is the case here.

Antonio also experienced actual violent attacks. During her credible fear interview, she told the asylum officer that she was whipped by her uncles "frequently because they wanted [her] to give them food and money" and that her uncles "insulted [her] about being a lesbian." Her uncles hurt her "[m]any times," starting "five months" before her interview. *Cf. Hoxha v. Ashcroft*, 319 F.3d 1179, 1182 (9th Cir. 2003) (denying a claim for past persecution based on physical abuse that occurred only one time). In his report finding Antonio's fear credible, the asylum officer summarized Antonio's claim as alleging that "people from [her] village *and [her] family members* are *motivated* to harm [her] with at least one central reason being that they believe that [she is] a member of the particular social group that is lesbian women in Guatemala." Although the record does not reveal the extent of the injuries Antonio sustained from these beatings, "we do not require severe injuries to meet the serious-harm prong of the past-persecution analysis." *Singh*, 48 F.4th at 1068 (citing *Flores Molina*, 37 F.4th at 636). Rather, "'it is the conduct of the persecutor' that is relevant to evaluating whether past treatment rises to the level of persecution—not 'the level of harm' or 'subjective suffering' the petitioner experienced." *Flores Molina*, 37 F.4th at 636 (quoting *Kaur*, 986 F.3d at 1226).[9]

Taken together, the death threats, mob violence, involuntary transport to the police station, and repeated whipping by her uncles[10] compel a conclusion contrary to

---

[9] Although Antonio's counsel never raised these beatings before the IJ, they were nevertheless in the record as part of Antonio's testimony to the asylum officer.

[10] The record is unclear whether the repeated whippings by the uncles *were on account* of Antonio being perceived as a lesbian. And, as noted,

the IJ's determination. *See Borja v. I.N.S.*, 175 F.3d 732, 736–37 (9th Cir. 1999) (en banc), *superseded by statute on other grounds as stated in Parussimova v. Mukasey*, 555 F.3d 734, 739–40 (9th Cir. 2009); *Singh*, 48 F.4th at 1067–69 (finding persecution in part because the petitioner "was forced to flee his home after being repeatedly assaulted" and faced a death threat).[11] Under our case law, this behavior amounts to past persecution.

## B. Nexus Requirement

Having established that she experienced harm rising to the level of persecution, Antonio must next satisfy the nexus requirement, showing that she was persecuted "*on account of* race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.

---

the IJ did not discuss the whippings at all. But the record at least admits of such a finding. The uncles insulted her "about being a lesbian." When the asylum officer specifically asked Antonio whether her uncles "ever start[ed] calling [her a] lesbian," she responded, "[T]hat is what they said the most." The asylum officer summarized Antonio's testimony by stating that her family was motivated to harm her at least in part because they perceived her to be a lesbian.

[11] Antonio's decision to flee Guatemala to escape persecution is itself relevant to our analysis. "[A]s we have consistently recognized, being forced to flee from one's home in the face of an immediate threat of severe physical violence or death is squarely encompassed within the rubric of persecution . . . ." *Mendoza-Pablo v. Holder*, 667 F.3d 1308, 1314 (9th Cir. 2012); *see also Flores Molina*, 37 F.4th at 633–34, 634 n.3;; *Knezevic v. Ashcroft*, 367 F.3d 1206, 1211–12 (9th Cir. 2004). Antonio explained that after the community brought her to the police, "[the community] never left [her] in peace," and her "grandfather cried because he was afraid they would do something bad to [her] and [she] was also very afraid, of the death threats," such that she "started to leave [her] country because that is what [her] neighbors . . . wanted [her] to [do]."

§ 1101(a)(42)(A) (emphasis added); *see Fon v. Garland*, 34 F.4th 810, 813 (9th Cir. 2022). Here, Antonio alleges membership in a particular social group.[12] She must demonstrate both that she belongs to such a group and that her membership was "at least one central reason for [her] persecution." *Zetino v. Holder*, 622 F.3d 1007, 1015 (9th Cir. 2010) (citing 8 U.S.C. § 1158(b)(1)(B)(i)).

Antonio's counsel proposed this particular social group to the IJ: "wom[e]n in Guatemala who are perceived to have male tendencies and are seen as dangerous to the community." The IJ found this articulation too "amorphous" for the court to "fit[] within the particular social group analysis." The IJ reasoned that "style of her dress is not an immutable characteristic to be considered under a particular social group," and that "this is not a gender issue" or a "sexual orientation issue" because Antonio stated she was not a lesbian.

This finding, however, ignores that Antonio's arguments before both the IJ and the BIA reasonably proposed a different particular social group: "women in Guatemala who are perceived to be lesbian."[13] During her credible fear

---

[12] Although the INA does not define "particular social group," we have said that the term refers to a group that is "united by a voluntary association, including a former association, *or* by an innate characteristic that is so fundamental to the identities or consciences of its members that members either cannot or should not be required to change it." *Hernandez-Montiel v. I.N.S.*, 225 F.3d 1084, 1093 (9th Cir. 2000), *overruled on other grounds by Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005) (en banc).

[13] Antonio's proposed particular social group has evolved somewhat, and she could have been clearer in her various presentations. But the heart of her claim was always that she was persecuted because the villagers

interview, Antonio stated that although she is not a lesbian, "people can think that . . . [a] person is perhaps a lesbian." At the hearing before the IJ, her counsel noted that she was "perceived to have male tendencies." In the notice of appeal to the BIA, Antonio reiterated that she was persecuted "for dressing like a boy" and that "the town believed [her] to be a lesbian." Her brief to the BIA notes that her persecution was based on "gender roles" and that "her claim was based on the perception that the community-at-large had of her being a lesbian because of her manner of dress." The brief further predicated Antonio's claim for asylum on the "perception that she was a lesbian, which went against the ingrained principles of gender roles in Guatemala, and what the community expect[s] its women to dress like, behave like and be like." The record demonstrates that Antonio sufficiently proposed the social group of women in Guatemala that are perceived as lesbian.

"IJs and the BIA are not free to ignore arguments raised by a petitioner." *Sagaydak v. Gonzales*, 405 F.3d 1035, 1040 (9th Cir. 2005). Failure to address a social group claim, or failure to analyze such a claim under the correct legal standard, "constitutes error and requires remand." *Rios v. Lynch*, 807 F.3d 1123, 1126 (9th Cir. 2015). Our decision in *Perdomo v. Holder* is illustrative. 611 F.3d 662 (9th Cir. 2010). There, a petitioner "sought asylum based on her fear of persecution as a young woman in Guatemala." *Id.* at 663. The petitioner alleged a particular social group "consisting of women [in Guatemala] between the ages of fourteen and forty." *Id*. at 664. The IJ determined that the petitioner credibly feared persecution, but declined to recognize her

---

perceived her to be a lesbian. Her proposed social group is clear enough to allow the agency to conduct the required social group inquiry.

proposed social group.  *Id.* at 664–65.  The BIA affirmed, concluding in part that the category of "women between the ages of fourteen and forty who are Guatemalan and live in the United States" and the petitioner's revised category of "all women in Guatemala" were too broad to constitute particular social groups.  *Id.* at 665, 668.  We granted the petition for review, "reject[ing] the notion that a persecuted group may simply represent too large a portion of a population to allow its members to qualify for asylum."  *Id.* at 669 (citing *Singh v. I.N.S.*, 94 F.3d 1353, 1359 (9th Cir. 1996)).

Concluding that the BIA erred in its social group analysis, the *Perdomo* panel explained "that under the ordinary remand rule, the agency should be given an opportunity in the first instance to make legal determinations entrusted to it by Congress."  *Id.* (citing *Gonzales v. Thomas*, 547 U.S. 183, 185 (2006)).  Neither the BIA nor this Court had previously recognized a social group of women in Guatemala.  *Id.* at 667–69.  The panel emphasized that the ordinary remand rule is "particularly applicable" in the context of social group analysis because the term "particular social group" is "amorphous."  *Id.* at 669 (cleaned up) (quoting *Ramos-Lopez v. Holder*, 563 F.3d 855, 859 (9th Cir. 2009), *abrogated on other grounds by Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1093 (9th Cir. 2013) (en banc)).  Accordingly, the panel remanded "for the BIA to determine in the first instance whether women in Guatemala constitute a particular social group, and, if so, whether [the petitioner] demonstrated a fear of persecution 'on account of' her membership in such a group."  *Id.* at 669 (citing *Thomas*, 547 U.S. at 185).

Our course here must be the same.  We have concluded that the IJ erred in construing Antonio's proposed social

group as "manner of dress" when it was in fact "women in Guatemala who are perceived to be lesbian." For the reasons explained above, Antonio's manner of dress was one reason her community associated her with the relevant proposed social group, not the basis of the group itself. Thus, the agency failed to conduct its particular social group analysis with respect to the correct group—women perceived to be lesbians.

Neither our Court in a published opinion nor the BIA has explicitly recognized perceived or imputed sexual orientation as a cognizable social group, though we have discussed the issue. Our precedent establishes that "[r]ape and sexual abuse due to a person's gender identity or sexual orientation, *whether perceived or actual*, certainly rises to the level of torture for CAT purposes." *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1079 (9th Cir. 2015) (emphasis added); *see also Vitug v. Holder*, 723 F.3d 1056, 1064 (9th Cir. 2013) (reversing the BIA's withholding of removal determination in part because the BIA ignored the IJ's finding that the petitioner "was harassed and threatened by the police because of his perceived sexual orientation"). The agency has also "assumed that the abuse [a petitioner] faced in his youth . . . qualifies as persecution due to his perceived sexual orientation, creating a 'presumption' that he would be persecuted in the future as well." *Iraheta-Martinez v. Garland*, 12 F.4th 942, 955 (9th Cir. 2021) (quoting 8 C.F.R. § 1208.16(b)(1)(i)). And at least two of our unpublished cases recognize "perceived sexual orientation" as a cognizable social group. *See Cruz Lopez v. Garland*, 849 F. App'x 186, 190 (9th Cir. 2021); *see also Pozos v. Gonzales*, 141 F. App'x 629, 631, 631 n.1 (9th Cir. 2005) (referring to petitioner's "perceived homosexuality").

But, again, neither a published opinion from our Court, nor any decision from the BIA, does so.

Thus, we grant Antonio's petition for review and remand for the agency to determine: (1) whether women in Guatemala perceived to be lesbian constitute a particular social group; and (2) if so, whether Antonio's persecution was "on account of" her membership in that group. *See Perdomo*, 611 F.3d at 669; 8 U.S.C. § 1101(a)(42).[14]

### C. Government Involvement or Acquiescence

The final inquiry is whether Antonio's persecution was committed by the government or by forces that the government was unwilling or unable to control. *See Madrigal v. Holder*, 716 F.3d 499, 506–07 (9th Cir. 2013).[15]

---

[14] We note that Antonio's community threatened to burn her unless she removed the men's clothing. They told her that if she didn't leave, they would kill her, because "they did not want any lesbian women in the village." And they took her to the police, and met her at her workplace to lynch her, presumably for this same reason. She "was dressing like a man to find work" to support her family. Antonio's "grandparents . . . told [her] not to work so the community would not hurt [her]." Her uncles, who frequently whipped her, "insulted" her about being a lesbian—"that is what they said the most." One of her family members stated that Antonio experienced "discrimination and threats *because she dressed as a man*." The asylum officer summarized Antonio's credible fear interview testimony as stating that "people from your village *and your family members* are motivated to harm you with at least one central reason being that they believe that you are a member of the particular social group that is lesbian women in Guatemala." And the local court denounced the behavior Antonio complained of as "crimes of *[d]iscrimination*, insult and threats."

[15] The Government argues that Antonio waived her challenge to this prong. But we exercise our discretion to review the IJ's decision on this issue because "the government briefed it, and thus suffers no prejudice from [Antonio's] failure to properly raise the issue." *Singh v. Ashcroft*,

The IJ's analysis focused on Antonio's complaint to the Justice of the Peace and the Justice of the Peace's decision to remit the matter for criminal investigation. But this decision does not end the inquiry. No record evidence indicates whether the criminal referral by the Justice of the Peace led to any arrests, criminal prosecution, or other action by authorities to minimize the threats against Antonio.[16] When the government has promised future action but taken none, we have concluded the government was either unable or unwilling to exercise such control. *See J.R. v. Barr*, 975 F.3d 778, 782-83 (9th Cir. 2020).

Further, "where there is any indication that the [agency] did not consider all of the evidence before it . . . the decision cannot stand. Such indications include . . . failing to mention highly probative or potentially dispositive evidence." *Cole v. Holder*, 659 F.3d 762, 771–72 (9th Cir. 2011).[17] Here, the IJ did not explore Antonio's statement that the mayor of her village "would be behind [her neighbors] if they try to kill

---

361 F.3d 1152, 1157 n.3 (9th Cir. 2004). The issue is exhausted because Antonio raised and argued the past persecution claim in her brief before the BIA. *See Aden v. Holder*, 589 F.3d 1040, 1047 (9th Cir. 2009). We note that Antonio did not argue to the agency, and does not contend on appeal, that government actors were directly involved in her persecution. Rather, she claims that local police were unwilling to address her persecution.

[16] As submitted in her I-589 application, Antonio left Guatemala on January 2, 2014, shortly after the referral on December 28, 2013. We leave it to the agency to determine the relevance, if any, of this fact.

[17] Again, we note that Antonio's counsel did not raise much of the evidence discussed below at the hearing before the IJ or in briefing on appeal to the BIA. Nevertheless, this evidence was in the record before the IJ and is "highly probative" in light of the relevant particular social group. *Cole*, 659 F.3d at 771–72.

[her]." Antonio told the asylum officer that she fears the mayor the most because "[h]e is the one who has the last decision whether to kill me or not." The IJ's omission of this evidence in her order suggests that the IJ may have failed to consider it.

Second, the record shows that the police took *some* action to end her harassment temporarily but did not make any arrests—even when the police arrived at the scene of a crowd threatening to kill Antonio. The IJ did not explicitly note this evidence, including evidence that despite police awareness, the death threats continued. We find nothing in the record to suggest that the police took any specific action to address Antonio's persecution. *See Mashiri*, 383 F.3d at 1115 (finding persecution by forces the government was unable or unwilling to control where police "responded to the scene" of persecution but "never made any arrests"). And Antonio told the asylum officer that when she reported her harassment to the police, "they didn't pay attention." "[T]hey told me I have to tell them that I am not the kind of person that they think that I am."[18] The record also contains a statement from Antonio's relative that even following complaints "against the aggressors, they still bothered" Antonio. No matter the level of actual police involvement, the record demonstrates that Antonio's harassment continued after police were made aware.

Third, the IJ did not discuss that Antonio's uncles whipped her. The record is unclear about whether Antonio

---

[18] This at least suggests the possibility that the police not only refused to act, but also refused to act because of their perception of her sexuality. As noted above, the record could be read as attributing this statement to Antonio's uncles, but in context, it appears that she is referring to the police.

informed the local police of these beatings.  If the police took no steps to stop the violence she experienced at her uncles' hands despite knowing about it, this could show that the police were unwilling or unable to control the harm Antonio faced.

Finally, though the IJ considered the Country Condition Report as to Antonio's CAT claim, the report notes that Guatemala's antidiscrimination laws do not apply to LGBTI individuals who often face police abuse.  The government's efforts to address widespread discrimination against LGBTI people have been "minimal."   The IJ found the report irrelevant because Antonio stated she is not a lesbian.  But given the reasons for our remand, the agency might view this evidence differently.

For these reasons, we remand this issue.  We recognize that the agency may not need to reach this issue, depending on its social group and nexus determinations.  But in light of our articulation of Antonio's proposed particular social group, the agency should reconsider, should it reach the issue, whether the probative record evidence discussed above constitutes governmental inability or unwillingness to address Antonio's persecution.  *See I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002).  The BIA may remand to the IJ for further factfinding as necessary. *See id.* at 18.

## V. CONCLUSION

The agency erred in finding that the harm Antonio suffered did not rise to the level of persecution.  The agency also failed to analyze the correct social group and may have failed to analyze all probative evidence regarding the government's acquiescence in Antonio's persecution.  Accordingly, we grant the petition for review and remand for

further proceedings consistent with this opinion.

**PETITION        FOR        REVIEW        GRANTED;
REMANDED.**

---

SANCHEZ, Circuit Judge, concurring:

I concur in the majority's well-reasoned opinion.  I write
separately to address the question of perceived or imputed
sexual orientation and whether such group should be
recognized as a "particular social group" for purposes of
asylum relief under the Immigration and Nationality Act
("INA").  The majority correctly points out that no published
authority from our court or the Board of Immigration
Appeals ("BIA") has expressly recognized imputed sexual
orientation as a cognizable social group, and therefore
remand is warranted to allow the BIA to pass on this
question in the first instance.  *See Perdomo v. Holder*, 611
F.3d 662, 669 (9th Cir. 2010).  Under longstanding circuit
and BIA precedent, the answer to this question seems clear.

We have long recognized homosexual applicants as
members of a particular social group, as has the BIA.  *See
Karouni v. Gonzales*, 399 F.3d 1163, 1172 (9th Cir. 2005);
*Matter of Toboso-Alfonso*, 20 I. & N. Dec. 819, 822–23 (BIA
1990).  And the BIA has consistently held that applicants
persecuted for imputed grounds are eligible for asylum.  *In
Re S-P-*, 21 I. & N. Dec. 486, 489–90 (BIA 1996) (citing
*Matter of A-G-*, 19 I. & N. Dec. 502, 507 (BIA 1987)); *see
also Matter of T-M-B-*, 21 I. & N. Dec. 775, 777 (BIA 1997)
(an applicant for asylum must show "that the harm was
motivated, at least in part, by an actual *or imputed* protected
ground") (emphasis added).  In particular, the BIA has
emphasized the importance of the "perception of the

persecutor" in asylum claims that involve persecution on account of imputed protected characteristics:

> For example, an individual may present a valid asylum claim if he is incorrectly identified as a homosexual . . . in a society that considers homosexuals a distinct group united by a common immutable characteristic. In such a case, the social group exists independent of the persecution, and the perception of the persecutor is relevant to the issue of nexus (whether the persecution was or would be on account of the applicant's imputed homosexuality).

*Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 243 (BIA 2014).

This Court has adopted the same reasoning in other types of asylum claims. For example, we have held that to show persecution on account of political opinion, a petitioner need not prove that she "*actually* held a political opinion or acted in furtherance of it," but rather must provide evidence "that the *persecutor* was motivated by a *belief* that the petitioner held the political opinion." *Khudaverdyan v. Holder*, 778 F.3d 1101, 1106 (9th Cir. 2015) (citing *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483 (1992)). We have applied the same precept to imputed religious belief. *See Popova v. I.N.S.*, 273 F.3d 1251, 1258 (9th Cir. 2001) ("To establish a correlation between [the petitioner's] persecution and her political opinion and religion, she must show, by direct or circumstantial evidence, her persecutors' motive."). And we have held that persecution on account of membership in a particular social group includes persecution on account of perceived membership in that group. *See Thomas v.*

*Gonzales*, 409 F.3d 1177, 1188 (9th Cir. 2005), *cert. granted*, *rev'd on other grounds*, 547 U.S. 183 (2006).

It is no leap to conclude that imputed homosexuality and homosexuality alike confer membership in the particular social group of homosexuals. Indeed, as the majority recognizes, prior panels have applied BIA and circuit precedent to arrive at that conclusion in unpublished dispositions. *See Pozos v. Gonzales*, 141 F. App'x 629, 631 n.1 (9th Cir. 2005) ("There is . . . no longer any question that one can be eligible for asylum as a result of persecution he suffers on account of imputed homosexuality."); *see also Cruz Lopez v. Garland*, 849 F. App'x 186, 190 (9th Cir. 2021) ("[T]he record compels the conclusion that [the petitioner's] perceived sexual orientation was both 'a central reason' and 'a reason' for his persecution.").

The Immigration Judge in this case nonetheless concluded that because Antonio did not attest to being a lesbian, the persecution she suffered in Guatemala was "not a sexual orientation issue": It was instead no more than a "dress issue." This finding focused exclusively on Antonio, assigning no weight to the perceptions of her persecutors. But to establish persecution on account of a protected characteristic, Antonio was not obligated to prove that she is homosexual. Rather, she was required to provide evidence that her persecutors were "motivated by a *belief*" that she is. *See Khudaverdyan*, 778 F.3d at 1106. Faithful application of the foregoing precedent should lead the BIA to the same conclusion.