**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

NELSON PANDA; FREDY JEREMIA
MBANDO PANDA,

  Petitioners,

v.

PAMELA BONDI, Attorney General,

  Respondent.

No. 24-6795

Agency Nos.
A246-843-086
A246-843-087

MEMORANDUM[*]

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted March 6, 2026
Seattle, Washington

Before: PAEZ, BEA, and BRESS, Circuit Judges.

Nelson Panda and his son (collectively, "Panda"), natives and citizens of

Angola, petition for review of a Board of Immigration Appeals (BIA) decision

dismissing their appeal of an immigration judge's (IJ) order denying their

applications for asylum, withholding of removal, and Convention Against Torture

relief. We ordinarily presume the agency reviewed the entire factual record. *Cruz*

---

[*] This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

*v. Bondi*, 146 F.4th 730, 739 (9th Cir. 2025). But where there is "indication that the agency did not consider all of the evidence before it," for instance, by "failing to mention highly probative or potentially dispositive evidence," remand is appropriate. *Antonio v. Garland*, 58 F.4th 1067, 1077 (9th Cir. 2023) (brackets omitted) (quoting *Cole v. Holder*, 659 F.3d 762, 771–72 (9th Cir. 2011)). Further, we have granted petitions for review when the IJ misstated the record in material ways. *See Cole*, 659 F.3d at 771–72 (holding that an agency decision "cannot stand" where the agency materially "misstat[es] the record"). We have jurisdiction under 8 U.S.C. § 1252. We grant the petition for review and remand for further consideration.

1. The agency decisions misunderstood the relevance of Panda's wife's attack in finding that its isolated nature was not a pattern of persecution closely tied to Panda. For "'harm to a petitioner's close relatives, friends, or associates [to] contribute to a successful showing of past persecution,' it must be 'part of a pattern of persecution closely tied to the petitioner himself.'" *Sharma v. Garland*, 9 F.4th 1052, 1062 (9th Cir. 2021) (brackets omitted) (quoting *Wakkary v. Holder*, 558 F.3d 1049, 1060 (9th Cir. 2009)).

The IJ concluded that "[i]solated violence against a family member cannot establish persecution sufficient for asylum because a 'pattern of persecution' tied to the respondent is required." The BIA similarly concluded that Panda "did not show

2                                                                          24-6795

the isolated attack against his wife and child was part of a pattern of persecution, particularly given that his wife has remained in Angola since this incident without experiencing additional harm."

However, the fact that Panda's wife and child were attacked once does not mean the attack was not part of a pattern of persecution connected to Panda. The brutal attack took place only four days after Panda was released from detention. The incident was not "isolated" given its close timing to Panda's release, as well as the facts that the assailants explicitly sought out Panda, assaulted his wife, and put his child in a confined space until his wife revealed Panda's location.

2. In addition, the agency either failed to adequately consider key features of Panda's claim of political persecution, or else misstated the record in ways that materially understated Panda's account of persecution.

a. Regarding the circumstances of Panda's release from custody after he was arrested on suspicion of arson in connection with an anti-government political event, the IJ noted in summarizing Panda's testimony that Panda was released because "[i]t turns out [Panda's] wife was a hairstylist and the police chief's wife was a customer of hers. His wife reached out to her for help in getting [Panda] released from jail. [Panda's] pastor was involved, and they were able to organize an 'intervention' to get [Panda] released." In finding no past persecution, the IJ focused on the fact that "[t]he police made no death threats, and they asked him where he would like to be

24-6795

dropped off after his release. [Panda] instructed the police to take him to his pastor's house which they did." The BIA found "no clear error in the [IJ's] finding that officers released him and dropped him off at his pastor's house like he requested."

These accounts do not reflect the full circumstances of Panda's release. The record shows that Panda was not simply released from jail at his family's request, as the agency decisions suggest. Panda's wife explained that the police chief informed her that "my husband's situation was complicated and that I may not see him again," and that she needed "to prepare some money to help with the resolution and his release without formal legal procedures." Panda attested that a police agent told his wife and pastor during his detention that "your husband is more at risk and you might never see him again," and "[t]he chief told my wife that there was a good chance that she would never see me again." The IJ and BIA therefore did not account for the fact that Panda's release was precipitated by the police chief conveying to Panda's wife that Panda was at risk of death, and that she had to bribe the police chief to get Panda out and save his life.

b. The agency decisions failed to account for Panda remaining in his pastor's home for 109 days for the purpose of hiding and being protected from the police and the Popular Movement for the Liberation of Angola (MPLA), the controlling party of the Angolan government. The IJ noted that Panda "remained residing with his pastor some 109 days until he left the country on December 25, 2022," and that

"[d]uring this time, he was not harmed or contacted by anyone looking for him. The police had dropped him off at his pastor's home with full knowledge of his location." The IJ further reasoned that the police "knew where [Panda] lived and could easily have recontacted him if needed but that never happened." The BIA similarly discussed that the "officers released [Panda] and dropped him off at his pastor's house like he requested." The agency decisions effectively treated Panda as residing at his pastor's home under comfortable circumstances with the government knowing his whereabouts.

This amounted to a material misstatement of the record. Record evidence shows that Panda was hiding from the police and MPLA at his pastor's home, and that not everyone within the police agency necessarily knew Panda's location. Panda explained that when the two police officers took him in the middle of the night from jail to his pastor's home, they "told [him] not to go outside." He also explained that "[n]o one knew where I was except my wife." After the attack on his wife, Panda considered turning himself in to the police, but he decided against it on his pastor's advice, because "the hardships would be worse than the first time." Panda's wife likewise noted that Panda sought "shelter" with the pastor and that she had not visited him at the pastor's house because "it was controlled by strangers." And the pastor confirmed that Panda "was at my residence seeking protection as they wanted to kill him." The record thus does not align with the agency's benign description of

Panda's time at his pastor's home. There is also no evidence that everyone in the police agency knew Panda was at his pastor's home. The record reflects that at most three members of the police were aware of Panda's location—the police chief and the two officers who released him from detention and told him to remain inside the pastor's home.

c. The IJ stated that Panda testified that "his wife is not afraid of living in Damba," but Panda testified "Yes, she lives in fear" in Damba, and also that she was in hiding there. Relatedly, the IJ and BIA did not account for specific record evidence that Panda's wife relocated for her protection and remained in hiding out of fear of another attack. Panda declared that after his wife's assailants "left and told her that they would be back," his wife "moved [to] a different part of Angola, in Damba . . . so she could stay safe," and she "lived there in hiding." Panda's wife likewise stated that she fled her home "for [her] protection."

For these reasons, the IJ and BIA decisions lack sufficient support based on the record as a whole. We therefore remand to the agency for further consideration on an open record.

**PETITION FOR REVIEW GRANTED; REMANDED.**[1]

---

[1] We grant the motion to stay removal, Dkt. 2, pending further proceedings before the agency.