**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MARIA RODRIGUEZ TORNES, AKA
Maria Rodriquez-Tornes,

*Petitioner*,

v.

MERRICK B. GARLAND, Attorney
General,

*Respondent.*

No. 19-71104

Agency No.
A088-669-863

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted February 3, 2021
Seattle, Washington

Filed April 5, 2021

Before: Susan P. Graber, M. Margaret McKeown, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Graber;
Concurrence by Judge Paez

## SUMMARY[*]

### Immigration

The panel granted Maria Rodriguez Tornes's petition for review of the Board of Immigration Appeals' decision reversing an immigration judge's grant of asylum and withholding of removal, and remanded, holding that the evidence compelled the conclusion that Rodriguez established a nexus between her mistreatment in Mexico and her feminist political opinion.

The panel noted that under the Attorney General's recent decision in *Matter of A-B-*, 28 I. & N. Dec. 199 (A.G. 2021) ("Matter of A-B- II"), in order to establish the requisite nexus for asylum relief, a protected ground (1) must be a but-for cause of the wrongdoer's act; and (2) must play more than a minor role—in other words, it cannot be incidental or tangential to another reason for the act. The panel explained that this standard was substantively indistinguishable from this circuit's precedent. The panel wrote that the fact that an unprotected ground, such as a personal dispute, also constitutes a central reason for persecution does not bar asylum. Rather, if a retributory motive exists alongside a protected motive, an applicant need show only that a protected ground is "one central reason" for his or her persecution.

Observing that this court has held repeatedly that political opinions encompass more than electoral politics or formal

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

political ideology or action, the panel wrote that it had little doubt that feminism qualifies as a political opinion within the meaning of the relevant statutes. The panel concluded that Rodriguez's testimony concerning equality between the sexes, her work habits, and her insistence on autonomy compelled the conclusion that she has a feminist political opinion. The panel also held that the record compelled the conclusion that Rodriguez's political opinion was at least one central reason for her past persecution. The panel explained that some of the worst acts of violence came immediately after Rodriguez asserted her rights as a woman, and that the fact that some incidents of abuse may also have reflected a dysfunctional relationship was beside the point, as Rodriguez did not need to show that her political opinion—rather than interpersonal dynamics—played the sole or predominant role in her abuse. By demonstrating that her political opinion was "one central reason" for her persecution, the panel concluded that Rodriguez likewise established that her political opinion was "a reason" for her persecution for purposes of withholding of removal.

Because in granting relief under the Convention Against Torture the agency necessarily determined that Rodriguez carried her burden to prove the other elements of her claims for asylum and withholding of removal, the panel concluded that Rodriguez's petition presented a recognized exception to the ordinary remand rule under *I.N.S. v. Ventura*, 537 U.S. 12 (2002) (per curiam). The panel explained that because the agency concluded that Rodriguez met the higher burden of establishing that she is likely to be tortured, she necessarily met the lower burdens for asylum and withholding relief of establishing that she has a well-founded fear, or clear probability, of persecution. Similarly, because the Board determined that the Mexican government would acquiesce to

Rodriguez's torture, the panel concluded that the Board had necessarily decided that the Mexican government would be unwilling or unable to protect Rodriguez from future persecution. The panel also concluded that because the Board determined that it would be unreasonable for Rodriguez to relocate within Mexico to avoid future torture, she likewise could not relocate to avoid future persecution.

The panel held that Rodriguez was thus eligible for asylum and entitled to withholding of removal, and it remanded for the Attorney General to exercise his discretion whether to grant Rodriguez asylum, and if asylum is not granted, to grant withholding of removal.

Concurring, Judge Paez wrote that in addition to ignoring evidence that Rodriguez was targeted on account of her feminist political opinion, the Board also ignored extensive record evidence from a leading authority on domestic violence that directly rejected the Board's premise that domestic violence is presumed to be motivated by nothing more than the private dynamics of a "personal relationship."

---

**COUNSEL**

Elaine J. Goldenberg (argued), Munger Tolles & Olson LLP, Washington, D.C.; Sara A. McDermott, Munger Tolles & Olson LLP, Los Angeles, California; Richard Caldarone, Julie Carpenter, and Rachel Sheridan, Tahirih Justice Center, Falls Church, Virginia; for Petitioner.

Timothy Bo Stanton (argued), Trial Attorney; Sabatino F. Leo, Senior Litigation Counsel; Office of Immigration

Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Blaine Bookey, Karen Musalo, Neela Chakravartula, and Anne Peterson, Center for Gender & Refugee Studies, U.C. Hastings College of Law, San Francisco, California, for Amicus Curiae Center for Gender & Refugee Studies.

Betsey Boutelle, DLA Piper LLP (US), San Diego, California; Anthony Todaro, Jeffrey DeGroot, and Lianna Bash, DLA Piper LLP (US), Seattle, Washington; for Amicus Curiae National Immigrant Women's Advocacy Project.

## OPINION

GRABER, Circuit Judge:

Petitioner Maria Luisa Rodriguez Tornes, a native and citizen of Mexico, testified to a lifetime of severe abuse from her mother, her estranged husband, and her partner for, in their eyes, being insufficiently subservient to men. An immigration judge ("IJ") granted asylum, and alternatively granted withholding of removal and protection under the Convention Against Torture ("CAT"), in a detailed decision. The Board of Immigration Appeals ("BIA") reversed in part, holding that Petitioner's past persecution and fear of future persecution lacked a nexus to a protected ground. Because the record compels a contrary conclusion, we grant the petition and remand for further proceedings.

FACTUAL AND PROCEDURAL HISTORY

Since the age of five, Petitioner has been told that men will beat her if she does not submit. Her mother demanded that she learn how to do housework, how to accept spousal abuse, and how "to obey everything that [her] husband would say." She beat Petitioner with various objects almost daily, in part to prepare her for future beatings from her husband. Yet Petitioner came to believe that "there should be equality in opinions[] and in worth" between men and women. She became a teacher.

Petitioner's husband, Esteban Baron Mata, began a regime of grueling abuse months after they married. When he once wanted food at 1 a.m., for example, he awakened Petitioner by sticking a lit cigarette into her arm and ordered her to cook. She told him to do it himself; he grabbed her hair and dragged her into the kitchen. Petitioner "had to do it because [she] was his woman, [she] was his wife, and it was [her] responsibility to serve him," he said. On another occasion, he burned Petitioner's face with a cigarette because she refused to leave her teaching job. He told her that she had no right to work and that, as a man, it was his duty to provide. "You think that because you studied, you can step on me," he said during one beating. "You're not going to step on me. I'm the man and you're going to do what I say." Petitioner said that she did not report her husband's abuse to the police because doing so would have been futile. When a friend tried to report her own husband, a police officer told her to stop gossiping, return home, and do her "duties."

Baron[1] left Petitioner in 1993 when she was pregnant. Her Catholic family prohibited divorce and required that she live with them until Baron returned. Petitioner fled to the United States. Years later, in phone calls and messages through Facebook, Baron sought Petitioner's location and insisted that they reunite. After Petitioner changed her phone number and deleted her account on Facebook, Baron visited Petitioner's daughter. He appeared aggressive and threatened "revenge." "His family also says that he is still a violent man towards women and beats" his current girlfriend.

Petitioner met Jorge Hernandez Fernandez in Phoenix, Arizona. They moved in together. He, too, beat, raped, burned, and strangled her. Petitioner's assertions of female independence and equality prompted his abuse. When Petitioner declined to give Hernandez money so that she could save for household expenses, he cut her with a broken beer bottle and raped her. "If you're not going to give me money, give me sex," he said. During another instance when Petitioner declined sex, Hernandez responded that she had no choice in the matter because she was his property. When she spoke up in front of his friends in their home, he said that she had to just "come in and not say anything." He then punched her so hard that she suffered a vaginal hemorrhage.

The cycle of abuse occurred almost weekly. Hernandez said that Petitioner, as a woman, was not allowed to have opinions; Petitioner expressed opinions anyway; Hernandez abused Petitioner. When Petitioner took a job in which she would have to speak to men—despite Hernandez's demand that she not take such a job—he left bite marks and visible signs of strangulation on her neck to show other men that she

---

[1] The parties refer to Petitioner's abusers by their first surnames.

"had an owner." "What's wrong with it? . . . You're my woman, and they need to know it," he said. When she tried to kick him out, he returned and raped her. He also dictated her clothing. "I wasn't allowed to have an opinion about . . . anything," Petitioner wrote in her declaration. "He couldn't stand that I, as the supposedly weaker sex, was the breadwinner . . . ."

Petitioner and Hernandez had three children, all of whom are citizens of the United States. After several foiled attempts, Petitioner escaped the relationship.

In 2017, the government deported Hernandez to Guatemala and Petitioner to Mexico. Hernandez called Petitioner and her children, demanding to know where Petitioner now lived. Because he lacks family in Guatemala, Petitioner believes that Hernandez now lives in Mexico, where he has family and can obtain residency. Fearing for her safety, Petitioner returned to the United States. The government initiated removal proceedings against Petitioner in December 2017.

The IJ found Petitioner credible and granted her asylum. In the alternative, the IJ granted withholding of removal and CAT protection. The IJ found that Petitioner's feminist political opinion was at least one central reason for her past persecution by Baron and for her well-founded fear of future persecution by Baron and Hernandez. The IJ also found that Petitioner's membership in a particular social group of "Mexican females" was at least one central reason for her past persecution by Baron and for her well-founded fear of

future persecution by Baron and Hernandez.[2] Citing reams of documentary evidence, the IJ found that if the Mexican government did not condone violence against females, it at least "demonstrated a complete helplessness" to protect Petitioner.

The BIA affirmed the grant of CAT protection but reversed the grants of asylum and withholding of removal. It tersely disposed of the IJ's pages of factual findings. Citing the Attorney General's opinion in *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018) ("*Matter of A-B- I*"), the BIA held that "the record lacks findings that [Petitioner's] domestic partners abused her for 'reasons unrelated to their relationship[s].'" Nevertheless, the BIA did not disturb the IJ's finding that Petitioner is credible. It also acknowledged that Petitioner "suffered severe mental and physical abuse from her mother, her ex-husband, and her former domestic partner, including, but not limited to, repeated rapes, beatings, burns, and verbal and mental abuse." More broadly, the BIA did "not disturb the [IJ]'s factual findings regarding the 'pandemic' of violence against females in that country or the import of 'culturally constructed' and entrenched identity roles." The government did not challenge the IJ's findings that Petitioner (1) suffered past persecution and torture; (2) has a political opinion; and (3) is a member of a cognizable social group of Mexican females.

---

[2] The IJ found that Petitioner's feminist political opinion was "a reason" for persecution by her mother and that her membership in a particular social group of Mexican females was "at least one central reason" for her mother's persecution of her. But the IJ found that Petitioner lacks a well-founded fear of future persecution by her mother. Petitioner does not challenge that finding.

In affirming CAT relief, the BIA held that the IJ did not clearly err in finding that authorities acquiesced in Petitioner's torture and that it would be "unreasonable for her to relocate within Mexico." Petitioner timely petitions for review, challenging the denial of asylum and withholding of removal.**[3]**

## STANDARDS OF REVIEW

"Where the BIA conducts its own review of the evidence and law, rather than adopting the IJ's decision, our review is limited to the BIA's decision, except to the extent the IJ's opinion is expressly adopted." *Rodriguez v. Holder*, 683 F.3d 1164, 1169 (9th Cir. 2012) (internal quotation marks omitted). We review de novo the BIA's conclusions of law. *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1059 (9th Cir. 2017) (en banc).

We review for substantial evidence the agency's factual findings, "including whether an applicant was persecuted on account of h[er] political opinion." *Regalado-Escobar v. Holder*, 717 F.3d 724, 726–27 (9th Cir. 2013). Those findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

---

**[3]** Nothing in our opinion disturbs the agency's grant of CAT protection, which the government does not challenge.

## DISCUSSION

A. *General Principles*

To be eligible for asylum, Petitioner must prove that she is "unable or unwilling" to return to her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B)(i). Thus, Petitioner has the burden of establishing that (1) her treatment rises to the level of persecution or that she has a well-founded fear of future persecution; (2) the persecution was or would be on account of one or more protected grounds; and (3) the persecution was or would be committed by the government, or by forces that the government was unable or unwilling to control. *Baghdasaryan v. Holder*, 592 F.3d 1018, 1023 (9th Cir. 2010); *Rodriguez-Rivera v. U.S. Dep't of Immigr. & Naturalization*, 848 F.2d 998, 1005 (9th Cir. 1988) (per curiam). To obtain withholding of removal, Petitioner must show that her "life or freedom would be threatened in [Mexico] because of [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). "Past persecution 'triggers a rebuttable presumption of a well-founded fear of future persecution.'" *Singh v. Whitaker*, 914 F.3d 654, 659 (9th Cir. 2019) (citation omitted). At issue here is whether Petitioner "establish[ed] a nexus between [the] mistreatment and a protected ground." *Baghdasaryan*, 592 F.3d at 1023.

For asylum, Petitioner must show that a protected ground "was or will be at least one central reason" for persecution. 8 U.S.C. § 1158(b)(1)(B)(i).

A "central" reason is a reason of primary importance to the persecutors, one that is essential to their decision to act. In other words, a motive is a "central reason" if the persecutor would not have harmed the applicant if such motive did not exist. Likewise, a motive is a "central reason" if that motive, standing alone, would have led the persecutor to harm the applicant. As noted above, *persecution may be caused by more than one central reason, and an asylum applicant need not prove which reason was dominant*. Nevertheless, to demonstrate that a protected ground was "at least one central reason" for persecution, an applicant must prove that such ground was a cause of the persecutors' acts.

*Parussimova v. Mukasey*, 555 F.3d 734, 741 (9th Cir. 2009) (emphasis added) (internal citations omitted). A central reason cannot be "incidental, tangential, superficial, or subordinate to another reason for harm." *Id.* (quoting *In re J-B-N- & S-M*, 24 I. & N. Dec. 208, 214 (B.I.A. 2007)).

That an unprotected ground, such as a personal dispute, *also* constitutes a central reason for persecution does *not* bar asylum. *Bringas-Rodriguez*, 850 F.3d at 1073. "[I]f a retributory motive exists alongside a protected motive, an applicant need show only that a protected ground is 'one central reason' for his [or her] persecution." *Madrigal v. Holder*, 716 F.3d 499, 506 (9th Cir. 2013) (citation omitted).

The Acting Attorney General recently agreed that our nexus standard is the correct one. "To establish the necessary

nexus, the protected ground: (1) must be a but-for cause of the wrongdoer's act; and (2) must play more than a minor role—in other words, it cannot be incidental or tangential to another reason for the act." *Matter of A-B-*, 28 I. & N. Dec. 199, 208 (A.G. 2021) ("*Matter of A-B- II*"). That test is substantively indistinguishable from our own. Under *Parussimova*, Petitioner must first show that "the persecutor would not have harmed [her] if such motive did not exist," 555 F.3d at 741, that is, but-for cause, *see But-for Cause*, Black's Law Dictionary (11th ed. 2019) ("The cause without which the event could not have occurred."). As discussed above, *Parussimova* next requires Petitioner to show that her protected ground was not "incidental, tangential, superficial, or subordinate to another reason for harm." 555 F.3d at 741 (citation omitted). In sum, *Matter of A-B- II* did not change the standard for establishing nexus, at least in our circuit.[4] The government's motion to remand so that the BIA can consider *Matter of A-B- II*'s effect on nexus is therefore denied.

## B. *Political Opinion*

Petitioner must establish two facts to show persecution on account of her political opinion. *Ahmed v. Keisler*, 504 F.3d 1183, 1192 (9th Cir. 2007). First, she "must show that [s]he held (or that h[er] persecutors believed that [s]he held) a political opinion." *Id.* (citing *Navas v. I.N.S.*, 217 F.3d 646, 656 (9th Cir. 2000)). Second, she "must show that h[er]

---

[4] And as we held recently, the Attorney General's opinion in *Matter of A-B- I* did not "endorse any sort of categorical" bar to asylum for those fleeing domestic violence predicated on a protected ground. *Diaz-Reynoso v. Barr*, 968 F.3d 1070, 1079 (9th Cir. 2020).

persecutors persecuted h[er] because of [that] political opinion." *Id.*

We have held repeatedly that political opinions "encompass[] more than electoral politics or formal political ideology or action." *Id.* Although "the mere presence of some political element does not require the conclusion that some maltreatment was on account of political opinion," *Kozulin v. I.N.S.*, 218 F.3d 1112, 1116 (9th Cir. 2000), applicants need not "espouse political theory," *Grava v. I.N.S.*, 205 F.3d 1177, 1181 (9th Cir. 2000). Like the Third Circuit, we have "little doubt that feminism qualifies as a political opinion within the meaning of the relevant statutes." *Fatin v. I.N.S.*, 12 F.3d 1233, 1242 (3d Cir. 1993).**[5]**

Direct and indirect evidence can show that persecution was on account of a political opinion. *Singh v. Holder*, 764 F.3d 1153, 1159 (9th Cir. 2014). "Testimony regarding a persecutor's statements serves as direct evidence that the persecution was motivated by a political opinion . . . ." *Id.* So long as the IJ finds that a petitioner is credible, that testimony can come from the petitioner herself. *Id.* A short temporal gap between a petitioner's actual or imputed assertion of a political opinion and her mistreatment provides "indirect evidence of a nexus." *Khudaverdyan v. Holder*, 778 F.3d 1101, 1107 (9th Cir. 2015).

Here, substantial evidence does not support the BIA's conclusion that the record lacks evidence of a nexus between Petitioner's persecution and her political opinion. At the

---

**[5]** We have held the same in a non-precedential disposition. *Moghaddam v. I.N.S.*, 95 F.3d 1158 (9th Cir. 1996) (unpublished) (citing *Fatin*, 12 F.3d at 1242).

outset, it bears repeating that the BIA did not disturb the IJ's factual findings regarding Petitioner's favorable credibility and the severity of her mistreatment. Therefore, the only two pertinent questions are those described above: (1) whether Petitioner had an actual or imputed political opinion, and (2) whether she was persecuted because of that political opinion. *Ahmed*, 504 F.3d at 1192. We are compelled to answer both questions in the affirmative.

First, Petitioner has a feminist political opinion. The government did not challenge that conclusion before the agency. To the extent that the BIA determined otherwise, Petitioner's testimony, work habits, and insistence on autonomy compel a contrary conclusion. Under our precedents, it is no answer that Petitioner did not engage in feminist "electoral" activities, *Ahmed*, 504 F.3d at 1192, or "espouse political theory," *Grava*, 205 F.3d at 1181. Petitioner's testimony that "there should be equality in opinions[] and in worth" between the sexes suffices.

Second, Petitioner was persecuted because of that political opinion. The record contains episode after episode of men stating, quite plainly, that they were beating, burning, raping, and strangling her *because* she sought an equal perch in the social hierarchy.[6] Hernandez left bite and strangulation marks on Petitioner after she took a job against his wishes, to show other men that she "had an owner." Petitioner's

---

[6] Petitioner's expert witness, Professor Nancy Lemon, described domestic abusers as generally harboring views that men should dominate women and squelch female independence. That testimony corroborates Petitioner's experiences; her persecution occurred when she expressed a contrary opinion, and her abusers expressly made the very points noted by Professor Lemon.

husband, Baron, burned a cigarette into her face because she refused to leave her job and, according to her husband, acknowledge "that [he] and [Petitioner] were not equals." Petitioner was doing something wrong, Baron said, by "providing money" when, "as a man, it was his duty to do [that]." When he said that Petitioner "didn't have th[e] right to have that job," Petitioner countered that she did. Baron responded by hitting her.

Indeed, some of the worst acts of violence came "immediately after" Petitioner asserted her rights as a woman. *Khudaverdyan*, 778 F.3d at 1107. After Petitioner said that she was not obligated to have sex whenever Hernandez wished, he said that "it was [her] obligation as a woman to serve him when he wanted," and he raped her. Similarly, after Petitioner bought her own trailer with her wages and attempted to prevent Hernandez's entry onto her property, Hernandez raped and strangled her so that she "would understand that he wasn't going to go anywhere."

The government's argument that there is no evidence that Baron and Hernandez were "aware" of Petitioner's political opinion thus lacks any rational basis. Petitioner does not claim that she was persecuted for being a feminist merely because she, a woman, was mistreated by men. Rather, she claims that she was persecuted when those men mistreated her because she expressly asserted to them her political opinion that she was their equal.

That some incidents of abuse may also have reflected a dysfunctional relationship is beside the point. *See Parussimova*, 555 F.3d at 741 (holding that "persecution may be caused by more than one central reason"). Petitioner need not show that her political opinion—rather than interpersonal

dynamics—played the sole or predominant role in her abuse. *See id.* (holding that "an asylum applicant need not prove which reason [is] dominant").

Thus, the record compels the conclusion that Petitioner's political opinion is at least one central reason for her past persecution and her presumptively well-founded fear of future persecution. *See Ahmed*, 504 F.3d at 1197 (holding that past persecution on account of a political opinion gives rise to a presumption of a well-founded fear of future persecution on account of that opinion). It then follows that Petitioner's political opinion is "a reason" for her persecution for purposes of withholding of removal. *See Barajas-Romero v. Lynch*, 846 F.3d 351, 359 (9th Cir. 2017) ("A person may have 'a reason' to do something that is not his [or her] 'central' reason or even 'one central reason.'").

## C. *Fear of Future Persecution*

Because the BIA determined that nexus is lacking, it "f[ound] it [un]necessary to address the [government's] argument that [Petitioner] . . . did not have a well-founded fear of future persecution." Yet it then held that the IJ did not err in granting CAT protection. To receive CAT protection, Petitioner had to prove "that it is more likely than not that . . . she will be tortured in the country of removal." *Parada v. Sessions*, 902 F.3d 901, 914 (9th Cir. 2018); 8 C.F.R. § 1208.16(c)(2).

Thus, this petition presents a recognized exception to the ordinary remand rule that we allow the BIA to decide issues in the first instance. *Singh*, 764 F.3d at 1163 (citing *I.N.S. v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam)). Because Petitioner "met the high burden of demonstrating that [s]he is

likely to be tortured, . . . [s]he necessarily meets the lower burden for eligibility for asylum that [s]he has a well-founded fear of future persecution." *Id.* In other words, when the agency grants CAT protection, it necessarily has decided that there is a well-founded fear of future persecution. *Fedunyak v. Gonzales*, 477 F.3d 1126, 1130 (9th Cir. 2007). Similarly, Petitioner "has demonstrated the existence of a clear probability of future persecution" for her withholding of removal claim. *Id.* at 1131. "Having established a nexus between h[er] persecution and . . . political opinion, and having established a well-founded fear of future persecution, a *Ventura* remand is unnecessary." *Singh*, 764 F.3d at 1163.

### D. *Inability or Unwillingness to Control Persecution*

The BIA did not discuss whether Petitioner fears persecution "by the government, or by forces that the government was unable or unwilling to control." *Baghdasaryan*, 592 F.3d at 1023. It did, however, affirm the IJ's finding that the Mexican government would acquiesce in Petitioner's torture. As with Petitioner's fear of future persecution, our precedents and the BIA's own opinion show that it necessarily decided that the government was unable or unwilling to control Petitioner's persecutors. "Public officials acquiesce in torture if, 'prior to the activity constituting torture,' the officials: (1) have awareness of the activity (or consciously close their eyes to the fact it is going on); and (2) breach their legal responsibility to intervene to prevent the activity because they are *unable or unwilling* to oppose it." *Garcia-Milian v. Holder*, 755 F.3d 1026, 1034 (9th Cir. 2014) (emphasis added) (citation omitted); *see also Cole v. Holder*, 659 F.3d 762, 771 (9th Cir. 2011) (holding that "[a]cquiescence by government officials 'requires only that [they] were aware of the torture but remained willfully

blind to it, or simply stood by because of their *inability or unwillingness* to oppose it'" (second alteration in original) (emphasis added) (citation omitted)).

Thus, on this record, the agency's finding that the government "would acquiesce" in Petitioner's torture necessarily includes the determination that the government would be unable or unwilling to stop Petitioner's future persecution, a less severe form of mistreatment than torture. *See Guo v. Sessions*, 897 F.3d 1208, 1217 (9th Cir. 2018) (holding that the concept of torture is more severe than persecution). That is especially so here, because the BIA parroted the Acting Attorney General's own standard for persecution in concluding that the government showed acquiescence by "routinely breach[ing] the duty to intervene in these matters." *See Matter of A-B- II*, 28 I. & N. Dec. at 204 ("The word 'persecution' therefore should be read to require that the government in the home country has fallen so far short of adequate protection as to have *breached its basic duty to protect its citizens* . . . ." (emphasis added)).

### E.  *Ability to Relocate*

If the government proves that Petitioner "can reasonably relocate internally to an area of safety," then she is ineligible for asylum. *Singh*, 914 F.3d at 659. In its analysis of asylum and withholding of removal, the BIA stated that it was unnecessary to address Petitioner's "ability to relocate" because it found nexus to be lacking. Once again, the BIA's holding with respect to Petitioner's CAT claim necessarily resolved that issue.

For purposes of asylum and withholding of removal, assessing Petitioner's ability to relocate "consists of two

steps: (1) 'whether [she] could relocate safely,' *and* (2) 'whether it would be *reasonable* to require [her] to do so.'" *Id.* (emphases added) (citation omitted). In resolving Petitioner's CAT claim, the BIA held that country conditions "render it *unreasonable* for [Petitioner] to relocate within Mexico." Accordingly, the BIA necessarily decided that Petitioner also could not relocate for purposes of asylum and withholding of removal.[7]

In sum, we hold that (1) we are compelled to conclude that Petitioner established a nexus between her mistreatment and political opinion and (2) the BIA necessarily concluded that she carried her burden to prove the other elements of her claims for asylum and withholding of removal.[8] Petitioner is thus eligible for asylum and entitled to withholding of removal.

---

[7] As we have noted before, *Akosung v. Barr*, 970 F.3d 1095, 1101 (9th Cir. 2020), the text of the regulation governing relocation under CAT, 8 C.F.R. § 1208.16(c)(3)(ii), lacks a requirement that the relocation be reasonable, whereas the regulations governing relocation under asylum and withholding of removal, *id.* §§ 1208.13(b)(1)(i)(B), 1208.16(b)(1)(i)(B), expressly require that the relocation be reasonable. But, as in *Akosung*, "nothing turns on the distinction *here*" because the BIA affirmatively found that relocation would be unreasonable, and because "[t]he government [has] not suggest[ed] that the standards in the two regulations are different." 970 F.3d at 1101 (emphasis added). To the contrary, in its brief to the BIA, the government lumped together the relocation analysis for asylum, withholding of removal, and CAT protection as a single issue.

[8] Because Petitioner established persecution on account of her political opinion, we need not decide whether she did so on account of her membership in a particular social group of Mexican females.

On remand, the Attorney General shall exercise his discretion in determining whether to grant Petitioner asylum. If he does not grant asylum, Petitioner shall receive withholding of removal.

**PETITION GRANTED AND REMANDED**. The panel shall retain jurisdiction over any future petitions for review.

PAEZ, Circuit Judge, concurring:

I join Judge Graber's fine opinion in full. I write separately on a point the court's opinion does not address. In rejecting Ms. Rodriguez Tornes's political opinion claim, the BIA suggests that the presence of a "personal relationship" motivation for intimate partner violence implies that there were no intersectional or additional bases for the violence Ms. Rodriguez Tornes experienced. The court's opinion thoroughly documents the record evidence, which the BIA ignored, demonstrating how Ms. Rodriguez Tornes was targeted for violence by her domestic partners on account of her feminist political opinion. The BIA, however, *also* ignored extensive record evidence from expert witness Prof. Nancy Lemon, a leading authority on domestic violence, that directly rejects the BIA's premise that domestic violence is presumed to be motivated by nothing more than the private dynamics of a "personal relationship."

In contrast to the BIA's "personal relationship" view of domestic violence,[1] Prof. Lemon draws on more than three

---

[1] The BIA cites *Matter of A-B-*, 27 I&N Dec. 316, 338–39 (A.G. 2018) as the basis for its assumption.

decades of research, writing, legal representation, and lawmaking to explain that "the socially or culturally constructed and defined identities, roles and responsibilities that are assigned to women, as distinct from those assigned to men, are the root of domestic violence." She analyzes data from the U.S. Department of Justice, Bureau of Justice Statistics and studies from leading medical and social science publications to highlight "compelling evidence that heterosexual domestic violence is, in significant part, motivated by bias against women and the belief that men are entitled to beat and control women." Prof. Lemon summarizes cross-cultural studies within the United States and internationally that demonstrate "a correlation between patriarchal norms that support male dominance and violence against women by intimate partners."

In her report, which the IJ referenced in her decision, Prof. Lemon provides a lengthy examination of social science research exploring how particular behaviors exhibited by male abusers—including emotional abuse, sexual abuse, marital rape, economic abuse, blaming, guilt and using children—are each tied to social belief systems that "men are entitled to dominate and control women because the male sex is considered superior" and operate to "exploit the traditional socially constructed roles, identities, duties and status of women in intimate relationships." In describing the legal, social, cultural, and political structures that lay the foundations for intimate partner violence, Prof. Lemon explains that "*domestic violence is not typically caused by behaviors unique to the victim or by inter-personal dynamics unique to the relationship between the abuser and the abused*. . . . Rather, heterosexual male batterers have certain expectations of intimate relationships with regard to which partner will control the relationship and how control will be

exercised. These expectations are premised on a dogmatic adherence to male privilege and rigid, distinct, and unequal roles for women and men."

The record evidence of Prof. Lemon's rigorous expert analysis undermines the BIA's unsubstantiated premise that, unless otherwise shown, domestic violence is a purely private matter. The BIA makes no mention of the record evidence of Prof. Lemon's expert analysis, let alone the decades of publicly available social science research and public policy that all reject the BIA's outdated view of domestic violence as a quirk within a "personal relationship."[2] Thus, the BIA's assertion that domestic violence is presumptively a private matter is not supported by substantial evidence.

---

[2] *See e.g.,* Nina Rabin, *At the Border Between Public and Private: U.S. Immigration Policy for Victims of Domestic Violence*, 7 Law & Ethics Hum. Rts. 109, 111–12 (2013) ("Fifty years ago, domestic violence was widely understood to be a private matter, and the extent to which it was appropriate for the state to intervene was highly contested. Now, domestic violence shelters, state laws and policies specific to the prosecution of domestic violence crimes, and significant state and federal government support for efforts to eradicate domestic violence are all commonplace. Crucial to bringing about this shift in the state's role vis-à-vis domestic violence victims has been the acknowledgment of the structural roots of domestic violence. When conceived of as a problem tied to gender subordination and pervasive inequality rather than interpersonal conflict, the violence at issue demands a state response."); *Violence Against Women: Victims of the System*, 102d Cong., 63 (1991); Elizabeth M. Schneider, *The Violence of Privacy*, 23 Conn. L. Rev. 973 (1991); Reva B. Siegel, *"The Rule of Love": Wife Beating As Prerogative and Privacy*, 105 Yale L.J. 2117 (1996); Leslye E. Orloff & Janice v. Kaguyutan, *Offering A Helping Hand: Legal Protections for Battered Immigrant Women: A History of Legislative Responses*, 10 Am. U. J. Gender Soc. Pol'y & L. 95 (2001); *see generally* Am. Br. of the National Immigrant Women's Advocacy Project.