**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSE ERNESTO ALEMAN-BELLOSO, | No. 23-114 |
| | Agency No. A206-871-954 |
| *Petitioner*, | |
| v. | ORDER AND AMENDED OPINION |
| PAMELA BONDI*, Attorney General, | |
| *Respondent*. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted April 12, 2024
Pasadena, California

Filed November 13, 2024
Amended February 18, 2025

Before: Marsha S. Berzon and Salvador Mendoza, Jr.,
Circuit Judges, and Michael T. Liburdi, District Judge.**

---

* We have substituted Attorney General Pamela Bondi as defendant-appellee pursuant to Federal Rule of Appellate Procedure 43(c).

** The Honorable Michael T. Liburdi, United States District Judge for the District of Arizona, sitting by designation.

Order;
Opinion by Judge Mendoza

**SUMMARY**[***]

**Immigration**

Granting Jose Ernesto Aleman-Belloso's petition for review of the Board of Immigration Appeals' decision upholding the denial of asylum and related relief, and remanding, the panel held that the Board erred in concluding that Aleman failed to establish a nexus between any persecution and his political opinion, erred by mischaracterizing his proposed social group, and improperly ignored probative evidence regarding government involvement in or acquiescence to any torture in El Salvador.

The panel agreed with the Board that Aleman failed to demonstrate a nexus between any harm and his religious belief. However, the panel concluded that there was not substantial evidence to support the Board's finding of no nexus between the persecution Aleman suffered and his political opinion and membership in a particular social group. The panel held that the record compelled the conclusion that Aleman held two political opinions. First, he believed it was wrong to use his role as a church leader to convince church members to support the FMLN—one of El Salvador's primary political parties. And second, he thought that the FMLN was "ruining the country." The record also

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

compelled the conclusion that the FMLN attacked Aleman *because* of his political-opinion-based refusal to use his role in the church to influence El Salvadoran politics.

The panel concluded that in rejecting Aleman's social group, the Agency erred in two important ways. First, the Agency mischaracterized Aleman's particular social group as consisting of "being a church leader who was persecuted because of his refusal to support the FMLN," where Aleman consistently characterized his proposed group as being comprised of "influential church leaders." Second, the Agency's mischaracterization of Aleman's social group led it to reject the group as "circularly defined and thus impermissible." The panel explained that under longstanding principles, a group may be deemed impermissibly "circular" if, after conducting the proper case-by-case analysis, the Board determines that the group is defined *exclusively* by the fact that its members have been subjected to harm. Here, the actual group that Aleman asserted to the Agency—influential church leaders—was not defined by reference to the harm he suffered, let alone exclusively by the harm suffered. The panel remanded for the Board to determine whether influential El Salvadoran lay ministers qualify as a particular social group. The panel also remanded for the Board to address in the first instance the Salvadoran government's involvement in, or its inability or unwillingness to control, any persecution.

The panel concluded that in denying CAT protection, the Agency erred by failing to consider probative evidence regarding government involvement in or acquiescence to Aleman's past torture. Because the Agency drew the unsupported conclusion that Aleman's past torture was not carried out with government acquiescence, and failed to consider, in its risk-of-future-torture analysis, record

evidence regarding the FMLN's continued power in El Salvador, the panel remanded for the Agency to reconsider Aleman's CAT claim.

## COUNSEL

Judith L. Wood (argued), Law Office of Judith L. Wood, Los Angeles, California; Patricia G. Gittelson, Law Office of Patricia G. Gittelson, Van Nuys, California; Beth S. Persky, Law Office of Beth S. Perky, Atlanta, Georgia; for Petitioner.

Rosanne M. Perry (argued) and Elizabeth K. Ottman, Trial Attorney; Leslie McKay, Senior Litigation Counsel; Melissa Neiman-Kelting, Assistant Director; Office of Immigration Litigation; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice, Civil Division, Washington, D.C.; for Respondent.

## ORDER

Respondent's motion to clarify or amend (Dkt. No. 59) is GRANTED. The opinion filed November 13, 2024, is hereby amended. The amended opinion will be filed concurrently with this order. No future petitions for rehearing or rehearing en banc will be entertained.

# OPINION

MENDOZA, Circuit Judge:

Jose Ernesto Aleman-Belloso ("Aleman"), a native and citizen of El Salvador, petitions for review of a decision by the Board of Immigration Appeals ("BIA") adopting and affirming an Immigration Judge's ("IJ") denial of his claims for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").  The IJ and BIA (together, the "Agency") deemed Aleman's testimony credible and found that he was subjected to torture at the hands of the FMLN—one of El Salvador's primary political parties.  But the Agency found that Aleman failed to establish a nexus between the harm he suffered and any protected grounds, and therefore rejected his claims for asylum and withholding of removal.  And the Agency denied CAT relief, finding it not likely that Aleman would be tortured again in the future.

Aleman challenges the Agency's denial of his asylum and withholding-of-removal claims on the basis that the Agency erroneously concluded that there was no nexus between the harm he suffered and his religious beliefs, political opinion, or membership in a particularized social group.  He also challenges the Agency's denial of CAT relief as unsupported by substantial evidence and on the basis that the Agency failed to consider relevant evidence in the record.

We conclude that substantial evidence does not support the Agency's denial of Aleman's asylum, withholding of removal, and CAT claims.  We grant the petition for review and remand all three claims for further proceedings.

## I.    BACKGROUND

Before leaving El Salvador in 2015, Aleman was an influential lay minister in the ELIM Christian Mission Church in his hometown of Lourdes Colon, La Libertad. He joined ELIM in 2012 and quickly became a leader in the church. In 2013, Aleman received a diploma from the church's School of Theological Leadership. He led family groups, formed youth groups to help keep local children off the streets and away from drugs, and inspired others by sharing his own story of overcoming hardship. Aleman presided over quarterly meetings attended by 300 to 400 community members and was well-known in Lourdes Colon for his work in the church.

In 2015, Aleman's influence in the community caught the attention of local members of the FMLN, El Salvador's primary left-wing political party. At the time, the FMLN controlled both the mayor's office in Lourdes Colon and the presidency in El Salvador. After a community meeting on February 21, 2015, Aleman was approached by three members of the FMLN—a representative of the mayor's office, the head of publicity for the party in the area, and another local party leader. There was an election coming up, and the FMLN leaders had in mind a strategic political proposition for Aleman. They wanted him to become "a member representative" and "introduce the [FMLN] to the members of [his] church so that [the FMLN] could win the elections." If he joined the party and encouraged church members to vote for the FMLN, they would reward Aleman with a salary from the mayor's office and provide additional benefits to his church.

Aleman did not give them an answer that day, but the FMLN was undeterred. A few days later, the mayor's

representative—Alex Figueroa—approached Aleman again, offering him a salary and touting public works that the FMLN would implement to benefit the community. This time, Aleman refused. He told Figueroa, "[N]o, I couldn't be a part of that." And as set forth in his declaration, Aleman further stated: "our country is a democratic country" and "neither I nor anyone else would influence political opinion in an individual way to support a certain political party."

As it turns out, the local FMLN leaders were right to be concerned about the party's prospects in the elections. Although the FMLN maintained the presidency, it lost the mayorship in Lourdes Colon.

Aleman suffered from the consequences of that election. Five days after the preliminary results of the election were announced, in the early morning of March 7, four masked gunmen attacked Aleman in his home. They grabbed him by the neck, threw him to the ground, kneeled on his back for forty minutes, and put a 9-millimeter caliber gun to his head, while ransacking his home. The man who pressed the gun to Aleman's head asked him why he "hadn't accepted the proposal of the party." They told Aleman that he had three days to get out of town, "that they didn't want to see [him] around anymore," and that they "didn't want [him] to form any more family groups" in the community.

Aleman did not report the attack to the police because he knew that any report would go to his local municipality, where the FMLN remained in power pre-transition to the newly elected party. Instead, he complied with their demands and left town to stay at his mother's house in a neighboring area. But after arriving at his mother's home, two gun-toting individuals tracked him down, warning him again "that they were not playing any games" and "that they

had already been very clear with [him],” reminding him that he had three days to leave the area.  On March 9, 2015, Aleman left El Salvador for the United States.

## II.  JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 8 U.S.C. § 1252(a).  Where, as here, the BIA cites *Matter of Burbano*, 20 I. & N. Dec. 872 (BIA 1994) and adds its own analysis to the IJ’s, we review both Agency decisions.  *See Ruiz-Colmenares v. Garland*, 25 F.4th 742, 748 (9th Cir. 2022).  The Agency’s determinations on questions of law are reviewed de novo. *Pirir-Boc v. Holder*, 750 F.3d 1077, 1081 (9th Cir. 2014). The Agency’s factual findings are reviewed for “substantial evidence” and “should be upheld ‘unless the evidence compels a contrary result.’”  *Budiono v. Lynch*, 837 F.3d 1042, 1046 (9th Cir. 2016) (quoting *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1184 (9th Cir. 2011)).  “A factual finding is not supported by substantial evidence when any reasonable adjudicator would be compelled to conclude to the contrary based on the evidence in the record.” *Aden v. Wilkinson*, 989 F.3d 1073, 1079 (9th Cir. 2021) (internal quotations and citation omitted).  “While this standard is deferential, ‘deference does not mean blindness.’” *Parada v. Sessions*, 902 F.3d 901, 909 (9th Cir. 2018) (quoting *Nguyen v. Holder*, 763 F.3d 1022, 1029 (9th Cir. 2014)).

## III.     DISCUSSION

### A.  Asylum & Withholding of Removal

To qualify for asylum “based on past persecution, an applicant must establish that: ‘(1) [his] treatment rises to the level of persecution; (2) the persecution was on account of one or more protected grounds; and (3) the persecution was committed by the government, or by forces that the

government was unable or unwilling to control.'" *Antonio v. Garland*, 58 F.4th 1067, 1073 (9th Cir. 2023) (quoting *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1062 (9th Cir. 2017) (en banc)). A showing of past persecution "gives rise to a rebuttable presumption of future persecution." *Sharma v. Garland*, 9 F.4th 1052, 1060 (9th Cir. 2021). To prevail on a claim for withholding of removal, an applicant "must show, by a preponderance of the evidence, that he will face persecution on account of a protected ground if removed." *Iraheta-Martinez v. Garland*, 12 F.4th 942, 955 (9th Cir. 2021).

Neither the IJ nor the BIA decided whether Aleman's treatment rose to the level of persecution, so we leave that issue to be resolved on remand.[1] We focus instead on Aleman's showing of (1) nexus to a protected ground; and (2) governmental involvement in, or unwillingness or inability to control, persecution.

### 1. Nexus Requirement

A petitioner seeking asylum must establish a nexus between the persecution and a protected ground. *Antonio*, 58 F.4th at 1074. To do so, he must show that he was persecuted "on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42)(A), and he must "demonstrate that one of the five protected grounds" was "at least one central reason for his persecution." *See Zetino v. Holder*, 622 F.3d 1007, 1015 (9th Cir. 2010) (citing 8 U.S.C. § 1158(b)(1)(B)(i)). The nexus standard for a withholding

---

[1] We do note that the Agency found that Aleman's treatment amounted to torture. "Torture is . . . inherently and impermissibly severe; and it is *a fortiori* conduct that reaches the level of persecution." *Nuru v. Gonzales*, 404 F.3d 1207, 1225 (9th Cir. 2005).

claim is not as demanding; the applicant need only demonstrate that one of the five protected grounds was "a" reason for the threat to his life or freedom. *Barajas-Romero v. Lynch*, 846 F.3d 351, 358 (9th Cir. 2017) (internal quotation marks and citation omitted).

The Agency found that there was no nexus between the harm Aleman suffered and his three asserted protected grounds—religious belief, political opinion, and membership in a particular social group. Although the applicable standard of review for the Agency's nexus determination is unsettled,[2] we agree with the Agency that Aleman failed to demonstrate any nexus between his harm and his religious belief. But even under the deferential substantial-evidence standard, we conclude that there was not substantial evidence to support the BIA's finding of no nexus between the persecution Aleman suffered and two protected grounds—his political opinion and membership in a particular social group.

---

[2] At times, we have held that when "an applicant is deemed credible, we . . . consider[] nexus issues to be questions of law entitled to *de novo* review." *Garcia v. Wilkinson*, 988 F.3d 1136, 1142 n.2 (9th Cir. 2021) (citing *Singh v. Ilchert*, 63 F.3d 1501, 1506 (9th Cir. 1995), *superseded by statute on other grounds as stated by Parussimova v. Mukasey*, 555 F.3d 734, 739–40 (9th Cir. 2009) & *Baghdasaryan v. Holder*, 592 F.3d 1018, 1022 n.4 (9th Cir. 2010)). But in other similar cases, we have applied the substantial-evidence standard to nexus issues related to a persecutor's motive. *See Vasquez-Rodriguez v. Garland*, 7 F.4th 888, 893 (9th Cir. 2021) ("Because '[a] persecutor's actual motive is a matter of fact,' we review that finding for substantial evidence." (quoting *Matter of N-M-*, 25 I. & N. Dec. 526, 532 (B.I.A. 2011))). Because our resolution of this appeal would be the same under either standard, however, "it is unnecessary to reach the issue of whether we review those determinations de novo or for substantial evidence." *Garcia*, 988 F.3d at 1142 n.2.

### i.    Religious Belief

The Agency's determination that Aleman did not establish that he was persecuted on account of his religious beliefs is supported by substantial evidence. Aleman does not contend that the attack following the FMLN's loss in the local elections was animated by his religious beliefs or practices. The Agency correctly rejected Aleman's asserted nexus of religious belief or practice.

### ii.    Political Opinion

To establish past persecution on account of a political opinion, Aleman must satisfy two requirements. "First he must show that he held (or that his persecutors believed that he held) a political opinion. Second, he must show that his persecutors persecuted him because of his political opinion." *Ahmed v. Keisler*, 504 F.3d 1183, 1192 (9th Cir. 2007) (citing *Navas v. INS*, 217 F.3d 646, 656 (9th Cir. 2000)). "We have held repeatedly that political opinions 'encompass[] more than electoral politics or formal political ideology or action.'" *Rodriguez Tornes v. Garland*, 993 F.3d 743, 752 (9th Cir. 2021) (alteration in original) (quoting *Ahmed*, 504 F.3d at 1192).

Here, the Agency found no nexus based on Aleman's political opinion because "the FMLN did not care whether [Aleman] agreed with their political goals or their political ideals or their political ideology . . . . Rather, they were just angry that he had not affirmatively used his influence to persuade his congregants to vote for the party." We conclude that substantial evidence does not support the Agency's finding.

The first element—that Aleman "held (or that his persecutors believed that he held) a political opinion,"

*Ahmed*, 504 F.3d at 1192—is readily met. The FMLN asked Aleman to join the party and leverage his role as a church and community leader to persuade church members to support the FMLN. But he told them, "[N]o, I couldn't be a part of that," because El Salvador "is a democratic country," and "neither I nor anyone else would influence political opinion in an individual way to support a certain political party." Aleman also provided credible, unrebutted testimony concerning the basis for his defiance, including his personal view that the FMLN president is an "ally of Cuba and Venezuela and so the country is out of control. These are the people that are ruining the country and the country is totally out of control."

The record compels a finding that Aleman held two political opinions. First, he believed it was wrong to use his role as a church leader to convince church members to support the FMLN. And second, he thought that the FMLN was "ruining the country."

The record also compels us to conclude that Aleman satisfies the second element: the FMLN attacked Aleman *because* of his political-opinion-based refusal to use his role in the church to influence El Salvadoran politics. *See Ahmed*, 504 F.3d at 1192. In determining whether a person is persecuted because of his political opinion, context matters. Generally, "[a] person's deeds express a political opinion only when they are 'sufficiently conscious and deliberate decisions or acts' such that society would naturally 'attribute[] certain political opinions to [the petitioner]' based on those acts." *Rodriguez-Zuniga v. Garland*, 69 F.4th 1012, 1017 (9th Cir. 2023) (quoting *De Valle v. INS*, 901 F.2d 787, 791 (9th Cir. 1990) (citation omitted)). Where, as here, the petitioner asserts that he expressed a political opinion in refusing to comply with a

persecutor's demands, the nature of those demands is integral to the analysis.

For instance, we have held that a petitioner's "refusal to give money to [a] threatening robber is not evidence of a 'conscious and deliberate' decision that would naturally result in attributing a political position" against "violence by criminal groups." *Rodriguez-Zuniga*, 69 F.4th at 1017–18. That makes sense; a person's bare refusal to give a robber money, without more, does not necessarily indicate that the person harbored a political opinion opposing crime. *Id.* at 1017 ("[M]ost people who resist criminal activity directed towards them do so for obvious non-political self-interested reasons—they don't want to be the victim of a crime."). Conversely, where a petitioner refuses to participate in or support a political organization, such refusal may well be a sufficient expression of a political opinion. *See Rodriguez-Matamoros v. INS*, 86 F.3d 158, 160 (9th Cir. 1996) (finding petitioner was persecuted on account of her political beliefs where she expressed those beliefs by "refus[ing] to participate in Sandinista organizations" and refusing to "become an informant for the Sandinista government"). Stated differently, a person who rebuffs a political organization "need not 'espouse political theory'" or deliver a soapbox speech to convey a political opinion. *See Rodriguez Tornes*, 993 F.3d at 752 (quoting *Grava v. INS*, 205 F.3d 1177, 1181 (9th Cir. 2000)). Rather, we look to whether "society would naturally attribute certain political opinions to the petitioner based on [his] acts." *Rodriguez-Zuniga*, 69 F.4th at 1017 (internal brackets and citation omitted).

The Agency misapplied our political-opinion precedent when it concluded that "the FMLN did not care whether [Aleman] agreed with their political goals or their political

ideals or their political ideology," and therefore did not persecute Aleman because of his political opinion. Like the petitioner in *Rodriguez-Matamoros*, who expressed her political opinion by "refus[ing] to participate in Sandinista organizations" and refusing "to become an informant for the Sandinista government," the record compels the conclusion that Aleman's rejection of the FMLN's proposition amounted to an expression of a political opinion. *See* 86 F.3d at 160; *see also Rodriquez Tornes*, 993 F.3d at 753 (holding that petitioner expressed feminist political opinions, in part, by taking a job against her abuser's wishes and refusing to leave her job). And the FMLN attacked Aleman because of that opinion, holding a gun to his head while demanding to know why Aleman "hadn't accepted the proposal of the party."**3**

### iii.    Particular Social Group

An applicant "seeking relief based on membership in a particular social group must establish that the group is:

---

[3] Relying on *Regalado-Escobar v. Holder*, the government contends that Aleman's "attackers were motivated by . . . his refusal to join them," and not his political opinion.  717 F.3d 724, 730 (9th Cir. 2013).  In *Regalado-Escobar*, the FMLN attacked the petitioner because he refused "to join them, increase their ranks, and participate in their violent activities," and the petitioner "offered no evidence to show that his attackers were even aware of his political beliefs."  *Id.*  Here, the FMLN attacked Aleman because he refused to act as the party's political operative.  Aleman told the FMLN that he "couldn't be a part of that" because El Salvador "is a democratic country and that neither [he] nor anyone else would influence political opinion in an individual way to support a certain political party."  Under these circumstances, the record compels the conclusion that Aleman's political opinion in opposition to using his position in the church to influence the democratic process in favor of the FMLN "was articulated sufficiently for it to be the basis of his . . . persecution."  *Id.*

'(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question.'" *Diaz-Reynoso v. Barr*, 968 F.3d 1070, 1077 (9th Cir. 2020) (quoting *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (BIA 2014)).[4] Whether a particular social group is cognizable is a question of law that we review de novo, *id.* at 1076, although the issue of "social distinction—whether there is evidence that a specific society recognizes a social group—is a question of fact that we review for substantial evidence," *Conde Quevedo v. Barr*, 947 F.3d 1238, 1242 (9th Cir. 2020). Here, the Agency rejected Aleman's particular social group as an "impermissible" basis for asylum or withholding of removal because it was "circularly defined." In doing so, the Agency erred in two important ways.

First, the Agency mischaracterized Aleman's particular social group. The BIA stated that "*respondent argues* he is entitled to relief as a member of the group consisting of 'being a church leader who was persecuted because of his refusal to support the FMLN.'" But Aleman never said that. The BIA lifted that language from the IJ's decision. Aleman,

---

[4] Under our precedent, "[a]n immutable characteristic is one that is *either*: (1) 'beyond the power of an individual to change,' *or* (2) 'so fundamental to [individual] identity or conscience that it ought not be required to be changed.'" *Diaz-Reynoso*, 968 F.3d at 1076 (emphasis added) (quoting *Matter of Acosta*, 19 I. & N. Dec. 211, 233–34 (BIA 1985), over*ruled in part on other grounds as stated in Matter of Mogharrabi*, 19 I. & N. Dec. 439, 441 (BIA 1987)). Or in the words of Judge Posner: "An immutable characteristic, as defined by the Board, need not be an innate characteristic . . . ; it just has to be something that can't be changed (or is so fundamental, equivalent to a person's religion, that he shouldn't be forced to change it." *Sepulveda v. Gonzales*, 464 F.3d 770, 771 (7th Cir. 2006) (Posner, J.) (citing *Matter of Acosta*, 19 I. & N. Dec. at 233).

in fact, argued before the BIA that "[h]e was recruited to campaign for the FMLN among his church community because he was a church leader. *He is a member of the social group of influential church leaders* and as such meets the particularity and social distinction" requirements. Aleman's argument before the BIA tracks the social group he described in his brief to the IJ, which argued that he "was believed to influence local votes because of his leadership role," "was a local church leader in El Salvador and as such had social visibility," and "was recognized as a church leader, evidenced by the fact that politicians from both political parties approached him for support." The IJ misconstrued the way that Aleman framed his group, representing instead that "[Aleman] defined his social group as being a church leader who was persecuted because of his refusal to support [the] FMLN." The record simply does not support the Agency's reframing of Aleman's social group.[5]

The Agency's mischaracterization of Aleman's social group, standing alone, was legal error that constitutes grounds for remand. *Alanniz v. Barr*, 924 F.3d 1061, 1069

---

[5] The government tries to rehabilitate the Agency's transformation of the articulated social group by pointing to Aleman's brief before the IJ, where he argued that "[h]e was persecuted because of his refusal as a church leader to support the FMLN." But that statement supports our conclusion. Aleman did not "define[] his social group as being a church leader who was persecuted." Rather, Aleman's use of the conjunction "because" demonstrates that he was arguing both (1) that he is a member of a protected group, church leaders, and (2) that a causal nexus linked his membership in that group to his persecution. Accordingly, the Agency's assertion that "*respondent argues* he is entitled to relief as a member of the group consisting of 'being a church leader who was persecuted because of his refusal to support the FMLN'" mischaracterizes Aleman's asserted social group and is supported by neither Aleman's briefing nor anything else in the record.

(9th Cir. 2019) (citing *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002)) (remanding because the BIA mischaracterized the petitioner's particular social group).

Second, the Agency's mischaracterization of Aleman's social group led it to reject the group as "circularly defined and thus impermissible." That holding, too, is reversible error. To start, the Agency's freestanding "circularity" analysis has no foundation in BIA or circuit precedent. To the contrary, in *Matter of M-E-V-G-* (the case on which the BIA relied), the BIA rejected DHS's attempt to impose "a separate requirement that the social group must exist independently of the fact of persecution," because that criterion was already part of the well-established particular-social-group analysis. 26 I. & N. Dec. at 236 n.11. Under that longstanding principle, "a group may be deemed impermissibly 'circular' if, after conducting the proper case-by-case analysis, the BIA determines that the group is 'defined *exclusively* by the fact that its members have been subjected to harm.'" *Diaz-Reynoso*, 968 F.3d at 1086 (quoting *Matter of M-E-V-G-*, 26 I. & N. Dec. at 242) (emphasis added).

Here, the actual group that Aleman asserted to the Agency—"the social group of influential church leaders"—is not defined by reference to the harm he suffered, let alone "exclusively" so. *See Diaz-Reynoso*, 968 F.3d at 1086. Indeed, even the Agency's misstatement of Aleman's proposed group—"the group consisting of being a church leader who was persecuted because of his refusal to support the FMLN"—is not defined exclusively with respect to the harm suffered. "[T]he conclusion that a proposed social group is impermissibly circular may not be reached summarily merely because the proposed group mentions harm." *Id.* That is exactly what the Agency did here.

Because the Agency mischaracterized Aleman's particularized social group and improperly rejected it on circularity grounds, it did not consider whether the group is cognizable. We therefore remand so that the BIA may determine whether influential Salvadoran lay ministers qualifies as a particular social group. *See Antonio*, 58 F.4th at 1076–77; *Alanniz*, 924 F.3d at 1069.

### 2. Government Involvement in, or Inability or Unwillingness to Control, Persecution

To qualify for asylum and withholding of removal based on past persecution, Aleman must establish that the "persecution was committed by the government or by forces that the government was unwilling or unable to control." *Antonio*, 58 F.4th at 1077. Aleman contends that he satisfies this requirement because the persecution he suffered was "committed by the government." *See id.* He notes that agents of the FMLN carried out the attack, and Aleman provided unrebutted testimony that the FMLN remained in power in his area at the time he was attacked. Because the Agency did not address government involvement or its inability or unwillingness to control the persecution Aleman suffered for purposes of asylum and withholding of removal, we remand so that the BIA may do so in the first instance. **[6]**

---

[6] In resolving Aleman's CAT claim, the IJ noted that Aleman did not report his torture "to the government and did not, therefore, provide an opportunity for the government to take any steps to prevent any harm to arrest those who had committed the harm." But this finding did not inform the Agency's denial of Aleman's asylum and withholding claims. We note that if the BIA finds on remand that, as Aleman contends, the "government is responsible for [the] persecution" that he suffered, "the third prong of our asylum inquiry is satisfied without further analysis.

## B.  Relief Under the Convention Against Torture

Under CAT, the United States is prohibited from returning someone to a country where "it is more likely than not that he or she would be tortured."  8 C.F.R. § 1208.16(c)(2).  "To qualify for relief under the Convention, the torture must be 'inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Zheng v. Ashcroft*, 332 F.3d 1186, 1188 (9th Cir. 2003) (quoting 8 C.F.R. § 208.18(a)(1)).  "Evidence of past torture is relevant 'in assessing whether torture is more likely than not.'"  *Nuru v. Gonzales*, 404 F.3d 1207, 1216 (9th Cir. 2005) (quoting *Kamalthas v. INS*, 251 F.3d 1279, 1282 (9th Cir. 2001) (internal brackets omitted)).  In evaluating a CAT claim, "the IJ must consider all relevant evidence; no one factor is determinative."  *Maldonado v. Lynch*, 786 F.3d 1155, 1164 (9th Cir. 2015) (en banc).  "[W]here there is any indication that [the Agency] did not consider all of the evidence before it . . . the decision cannot stand."  *De Leon v. Garland*, 51 F.4th 992, 1005 (9th Cir. 2022) (quoting *Cole v. Holder*, 659 F.3d 762, 771–72 (9th Cir. 2011)).

The IJ held that Aleman was tortured:

> [Aleman] was physically attacked, thrown to the ground, held there for about 40 minutes with someone's knee on him, had a [gun] held to his temple at that same time period, and then at least twice told that he had three days to leave his home, by the same men who

---

[And] [a]s a result, no inquiry into whether a petitioner reported the persecution to police [would be] necessary."  *Baballah v. Ashcroft*, 367 F.3d 1067, 1078 (9th Cir. 2004).

> then showed him guns, and the court finds
> that's torture.

The IJ based her finding on a well-developed record. Aleman credibly testified about the facts of his attack, during which he was pinned to the ground with a gun to his head. Aleman also credibly testified that after the attack, he fled to his mother's house some 40 minutes away, only to be targeted again by two gun-toting individuals who warned him "that they were not playing any games, . . . that they had already been very clear with [him]," and that Aleman had three days to get out of town.

But the IJ denied Aleman's CAT claim, holding:

> [A]t the time that [Aleman] was being
> harmed and threatened the FMLN had lost
> the election in his hometown, and as was
> brought out in testimony, while the [FMLN]
> was in national power at the time he came to
> the United States, a new president[, Nayib
> Bukele,] was being installed in June of 2019,
> a date which has already passed, and that
> president is not a member of the FMLN. And
> so the court finds that the pain and suffering
> and harm and threats that respondent suffered
> was not with the consent, acquiescence of, or
> at the instigation of a public official, and with
> the change in parties that it is not more likely
> than not that respondent will suffer torture in
> El Salvador.

The BIA summarily affirmed this holding, adding only that "[t]he respondent's claim appears to rest upon mere

speculation that he would necessarily be exposed to torture in El Salvador, and that authorities would fail to intervene to protect him." At bottom, the Agency's determination that Aleman failed to establish a likelihood that he would be tortured if returned to El Salvador rests on the conclusions that (1) the government did not acquiesce to Aleman's past torture because the FMLN lost the local election in Aleman's area five days before he was attacked, and (2) Nayib Bukele became president in 2019 and is not an FMLN member, so the FMLN lacks the power to torture Aleman in the future.[7] But these Agency determinations are not supported by substantial evidence and demonstrate that the Agency failed to consider probative record evidence.

The IJ's determination that the attack on Aleman was not "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity," *Zheng*, 332 F.3d at 1188, because the FMLN had lost in local elections five days before the attack is not supported by substantial evidence. The IJ recognized that the torture Aleman suffered was at the hands of FMLN agents. Aleman was attacked five days after the FMLN lost

---

[7] The IJ also noted that Aleman did not report his torture "to the government and did not, therefore, provide an opportunity for the government to take any steps to prevent any harm to arrest those who had committed the harm." It is unclear how this finding factored into the Agency's decision, as the IJ did not tie this finding into her analysis, and the BIA made no mention of this finding and cited no legal authority demonstrating its relevance. In any event, the IJ's suggestion that Aleman had to report his torture at the hands of the FMLN's foot soldiers to the police in order to establish that his torture was carried out under the imprimatur or with the acquiescence of public officials is wrong. We have "never required that an applicant report his alleged torture to public officials to qualify for relief under CAT." *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1060 (9th Cir. 2006).

the local election and was asked at gunpoint why he had not accepted the FMLN's proposal.  He asserts that "the FMLN still controlled local government in Lourdes Colon immediately after the elections that displaced them," and supports this assertion with unrebutted testimony.  In short, the IJ's finding that no public official was involved in the torture because the FMLN had lost in the local election five days prior lacks support and is contradicted by the record. *See De Leon*, 51 F.4th at 1004 (reversing the BIA's determination that petitioner failed to show government acquiescence because "the record compels the conclusion that [the attackers] were [government agents] at the time of the incident").

The determination that Aleman suffered past torture with government acquiescence does not "fully satisfy [his] burden to show that it is 'more likely than not' that he would be tortured should he return to" El Salvador. *See id.* at 1005. So, we remand for the BIA to readdress Aleman's likelihood of future torture.  In doing so, we note that the Agency appears to have ignored probative evidence regarding the FMLN's continued power throughout El Salvador.  Setting aside the FMLN's loss of one local election in 2015, the Agency ignored evidence that the FMLN held the presidency from 2009 to 2019, and that as of 2021, the FMLN and its right-wing rival ARENA controlled "70% of congressional and local seats" in El Salvador.  The FMLN therefore had a strong, ongoing presence in government throughout the country, a fact that the Agency did not mention.

Because the Agency drew the unsupported conclusion that Aleman's past torture was not carried out with government acquiescence, and failed to consider, in its risk-of-future-torture analysis, record evidence regarding the FMLN's continued power in El Salvador, the Agency's

denial of the CAT claim "cannot stand" and "must be redone." *See De Leon*, 51 F.4th at 1005 (quoting *Cole*, 659 F.3d at 771–72).

## IV.    CONCLUSION

The Agency found that Aleman was tortured by agents of the FMLN. The record compels the conclusion that Aleman was attacked because of his political opinion and refusal to engage in political proselytization.[8] The record also supports that the government acquiesced in Aleman's torture—the attack came just five days after the FMLN lost in local elections, while the FMLN remained in power. We therefore **GRANT** in part Aleman's petition, and **REMAND** to the BIA for further proceedings consistent with this opinion.

---

[8] Separately, as set forth above, the Agency committed legal error by mischaracterizing Aleman's particular social group. On remand, the Agency may or may not need to consider whether Aleman's social group is cognizable, depending on its resolution of Aleman's political opinion claim.